Argued July 12, 1973, affirmed January 31, 1974

STATE OF OREGON, *Respondent,* v.
· MARK LEE HIRSCH, *Petitioner.*

518 P2d 649

*J. Marvin Kuhn,* Deputy Public Defender, Salem, argued the cause for petitioner. With him on the briefs was Gary D. Babcock, Public Defender, Salem.

*John W. Osburn,* Solicitor General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and Walter L. Barrie, Assistant Attorney General, Salem.

BRYSON, J.

The defendant was indicted for a theft by receiving. ORS 164.095. The jury returned a verdict of guilty and the defendant appealed. The Court of Appeals by per curiam opinion, *State v. Mark Lee Hirsch,* 12 Or App 20, 503 P2d 726 (1972), held:

> "Affirmed. *State v. Keller,* 9 Or App 613, 497 P2d 868, Sup Ct *review allowed* (1972)."

We granted review because the Court of Appeals relied upon their decision in *Keller,* in which we granted review and reversed. *See State v. Keller,* 265 Or 622, 510 P2d 568 (1973).

A review of the evidence in this case reveals there is no similarity between the facts in the case at bar and those in *State v. Keller, supra.*

The defendant contends "[t]he search of defendant's truck and seizure of evidence were unreasonable because they were not made incident to an arrest, nor in an emergency situation, nor after the defendant had informatively given his consent, nor as a proper inventory search."

An examination of the transcript of evidence reveals the following facts. At approximately 2 a.m.

on February 6, 1972, Officers Now and Clayton observed a U-Haul truck parked behind a furniture store in Toledo, Oregon. Earlier, Officer Now had attempted to stop the truck but it had eluded him. The defendant and his friend, Mr. Hunt, were standing by the truck. Both men denied any connection with the truck but subsequently the defendant produced a "U-Haul Co. Truck Rental Contract" showing the truck had been rented to a Mr. Edward D. Mabe of Toledo, Oregon, destination Kansas City, Missouri. Defendant told the officers he was connected with Mr. Mabe and had custody of the truck and produced a key to it. Officer Now testified:

> "* * * We talked to him [defendant] for probably a half an hour and finally Mr. Hirsch asked us if we wanted to look in the back of the truck. We said that, you know, we would kind of like to see what was in it. We asked him what was in it. * * * Then he opened the truck and we saw that there were several types of appliances, refrigerator, electric stove, washer-dryer and some clothes and some other items inside. Clayton went in the back of the truck with the permission of Hirsch and inventoried a few of the things that were in there at that time."

The truck (cab with separate enclosed van) was approximately "20 percent full." Defendant stated he was from Nebraska and was taking his personal belongings to Nebraska. No arrest was made. The defendant and Mr. Hunt left in Hunt's car. The officers returned to their stations.

Mr. Hunt had no connection with the defendant's activities. They were old acquaintances and had met by happenstance about 10 p.m. Saturday, February 5, at the Keg Tavern, Toledo, Oregon. After several drinks they left with defendant's brother and went to another tavern. Hunt "had too much to drink" and

defendant drove Hunt's car around the Bay Road area and stopped at certain houses. Hunt testified:

"Well, each time one guy got out of the car and walked around the place, the house that they stopped at, then got back in the car and went to another one, two or three houses before we returned to Toledo.

"Q Did Mr. Hirsch make any comment about that on the way back to Toledo?

"A Yes, he made one comment that I know of, something to the effect that the house would be easy to loot.

"* * * * *.

"Q Did you contact Officer Clayton that night?
"A Yes.

"Q And what was your reason for doing that?
"A Well, I wanted him—wanted them to know that I wasn't involved in anything, that I really didn't know what I was mixed up in, so I just wanted them to know that I wasn't involved."

Officer Clayton testified:

"A Well, after I left the scene down there at Bateman's [furniture store] I went back to the office, and at the office Mr. Hunt came into there to talk to me."

Officer Now had asked to see the defendant's driver's license when he first contacted the defendant at the back of Bateman's furniture store. The defendant had told him he had a suspended license; "that he had driven down to the parking lot in Mr. Hunt's vehicle." After Hunt had talked to Officer Clayton, Clayton called (via radio telephone) Officer Now. Regarding this call, Officer Now testified:

"A Yes. I received a phone call from Gary Clayton from the Toledo P.D. indicating to me that Frank Hunt was in his office and had discussed what had proceeded previous to my coming in con-

tact with Mr. Hirsch and Mr. Hunt, and that he felt that it was reasonable to believe that the property inside the truck—

"MR. YECK: Objection, Your Honor. Hearsay.

"THE COURT: Sustained.

"* * * * *

"A * * * For most of the rest of the night I was looking for the truck. I did return to Toledo a short time after this incident, probably a half an hour after the incident, and at that time noticed that the truck was not parked any longer behind Bateman's Furniture; neither was the vehicle of Frank Hunt. I then went up to the Toledo Police Station, talked with Gary Clayton for some time and then went back to my patrol unit and searched the area, the bay area * * * for several hours. * * *"

Officer Now was to go off duty at 8 a.m. He was proceeding on Highway 20 toward Newport when the U-Haul truck passed him, going in the opposite direction. Officer Now turned around immediately and began pursuing the truck at high speed but could not overtake the truck. He radioed to Officer Clayton to intercept the truck at the Toledo junction. Officers Clayton and Smith observed the truck as it passed the junction and pursued it at a high rate of speed and finally stopped it. Defendant was driving the truck. Officer Now arrived at the scene. The defendant was placed under arrest for violation of the basic rule (speed) and operating a motor vehicle without an operator's license. The officer read to defendant his "Miranda" constitutional rights, which the defendant said he understood. Officer Now then asked the defendant if they could look in the truck. He testified:

"A I asked Mr. Hirsch if we could look in the back of the truck. His words were, 'You looked in the truck earlier. What do you want to look in it again for?' And I said, 'Well, if we did look in it

earlier as you said, you won't mind if we look in it again, will you?' And he said, 'No,' and he opened the truck.

"\* \* \* \* \*

"A At that time I observed that the truck was completely full of furniture and other household items including appliances and in addition to the items that we had seen in the truck earlier in the evening [morning]."

Defendant stated the property in the truck was his and he was taking it to Nebraska. Officer Clayton entered the van and wrote a brief description of the property. The defendant testified, on direct examination, that he was driving and had a suspended driver's license; that he had parked the truck "in back of Lou's Dog House in Newport" for the night. He further testified:

"A Well, they stopped me going east as I had just passed the Toledo junction. The Toledo policeman [Clayton] stopped me, and we talked for a few minutes and then the deputy [Now] drove up, and I believe the first thing he asked me for was my driver's license which I didn't have, and then he asked me if he could look in the back of the truck, and I told him that I didn't feel it was necessary beings as they had looked through the truck earlier, and he said that he felt it necessary. So I unlocked the truck and lifted the hood and he proceeded to look around the back of the truck, and I closed the deal, closed the hood and locked it \* \* \*.

"Q When the deputy looked in the back of the truck, did he indicate—did he say anything?

"A Only thing I remember him saying was, 'Just what I thought.'

"Q He said, 'Just what I thought,' when he looked in there?

"A Yes.

"Q Did he indicate to you what he was thinking about?

"A Yes, I knew what he was thinking.

"Q What's that?

"A I knew he was thinking the furniture was stolen.

"MR. DAUGHERTY: Your Honor, I will move to strike that last comment. I don't think the witness is competent to testify what the officer was thinking.

"THE COURT: If you insist, motion granted.

"MR. DAUGHERTY: Pardon me?

"THE COURT: Your motion is allowed."

The defendant testified at the hearing on the motion to suppress but did not take the witness stand at the jury trial.

The defendant locked the van portion of the truck and kept the key. The officers impounded the truck and parked it in the courthouse parking lot. Defendant was lodged in the Lincoln County jail and charged with the crime of theft.

On the same day that defendant was lodged in jail, February 6, Officer Stone of the Lincoln County sheriff's office made an inventory of the property in the van portion of the truck. Officer Stone testified:

"* * * I inventoried the items that were loose or available to inventory. There were quite a few items in the truck that were in cardboard boxes with masking tape. These I did not open."

On February 7 Mr. Thompkins, defendant's father-in-law, went to the sheriff's office to seek the release of the U-Haul truck and its contents in order to return the rented truck. Defendant, Mr. Thompkins, and Deputy Sheriff Now signed an "Order for release of

property" which provided that Mr. Thompkins would return the truck to the U-Haul Company and store the "contents (household furniture and appliances)" at his residence in Springfield, Oregon.

On February 12, 1972, a Mr. Olsen reported to the sheriff's office that his home had been burglarized. Most of the stolen items had been in the U-Haul van and were recovered from Mr. Thompkins upon the issuance of a search warrant.

Two officers asked the defendant for the key to the van, which he had hidden in his boot, so they could have Officer Stone inventory or get a description of the property. There is conflicting testimony from the officers and the defendant as to whether he consented to the last entry of the truck for the purpose of inventorying the property. The defendant first refused to give the officers the key to the van, but the evidence clearly shows that he subsequently gave his permission and produced the key. Two officers, Now and Clayton, had previously been in the van, with the defendant's consent, at the time he was arrested. In *State v. Marshall,* 234 Or 183, 184-85, 380 P2d 799 (1963), we held:

> "The state has the burden of establishing that defendant waived his constitutional protection from unreasonable search. It is defendant's position that the state did not produce sufficient evidence to meet this burden. * * * If officer Kennard's testimony is accepted as true, the evidence of consent would be clear and convincing.
>
> "* * * * *
>
> "The trial court in passing upon the motion to suppress, and the jury in passing upon defendant's guilt, were entitled to believe officer Kennard and disbelieve defendant. * * *"

Again, in *State v. Pogue*, 243 Or 163, 164, 412 P2d 28 (1966), we held:

"When the evidence with reference to consent is in conflict, the issue is one of fact for the trial court. The trial court's findings on such a question will not be disturbed if they are supported by evidence." Citing *State v. Marshall, supra*.

Regarding the defendant's consent to the inventorying of the contents of the van, the defendant testified on direct examination as follows:

"A  *  *  *  [T]hen he informed me that they would get a search warrant if necessary.  *  *  *

"*  *  *  *  *

"A  *  *  *  [F]inally I told the officer that they was [sic] going to get a warrant so they had my permission to take an inventory of the truck. They informed me that they would not disturb things in the truck and that the only reason they was [sic] going into the truck was because of their policy of taking inventory of vehicles.

"Q  You were given your constitutional rights at each interrogation?

"A  I was given my constitutional rights when I was arrested for driving on suspended driver's license; I was given my constitutional rights when the warrant for third degree theft, I believe is what it was from Toledo; I was given my constitutional rights when I was arrested on the assault and battery charge." (On February 6, after lodged in jail.)

On cross-examination, defendant testified:

"Q  Now, did you give the keys of the truck to Sergeant Dudley?
"A  Give them to him?
"Q  Yes.
"A  Personally or tell him he could have them?
"Q  Did you tell him he could have them?
"A  Yes.

"Q   Where were the keys?

"A   They were in my boot in my personal possession."

For the effect on an otherwise voluntary consent preceded by a statement that the officers would "get a warrant," see *State v. Douglas*, 260 Or 60, 488 P2d 1366 (1971), for a complete discussion of conflicting rules. In *Douglas* we held, at 74:

> "In most cases, however, the courts have sustained searches following findings that consent by defendants was voluntary even after being told by officers that otherwise they would, could, or were going to get search warrants. [Citations omitted.]"

It is obvious from the foregoing facts in this case that the officers had good cause and sufficient grounds for securing a search warrant. In Chief Justice O'CONNELL's dissent in *Douglas* (on another ground) it was held:

> "* * * The officer's threat that he would obtain a warrant if defendant did not consent to the search did not constitute the kind of coercion that renders a search involuntary. Concededly such a threat may be coercive in the sense that an accused would not have consented to the search in the absence of the threat. But not all coercion inducing consent to a search is constitutionally impermissible. If the officers threaten only to do what the law permits them to do, the coercion that the threat may produce is not constitutionally objectionable."

This portion of the dissenting opinion was concurred in by Justice HOLMAN.

██ Under the facts and circumstances of this case, we hold there was sufficient evidence to support the trial court's denial of the motion to suppress and that the consent given by the defendant was voluntary, uninfluenced by the conduct of the police officers. The

trial court, in denying the motion to suppress, was entitled to believe the officers—that the defendant consented to the inventory of the van's contents. The defendant was given Miranda pre-interrogation warnings on three occasions before the consent was obtained. Assuming that there is a conflict in the testimony between the defendant and the officers on the question of voluntary consent, we will not disturb the trial court's ruling because the issue is one of fact.

There is a further reason why this case should be affirmed. The defendant states, "So here while the police merely suspected the defendant of wrongdoing, say burglary or receiving, they did not have probable cause to arrest him for it." We do not agree.

■ After defendant's friend, Mr. Hunt, had talked to Officer Clayton and revealed that defendant had been "casing" residential homes and that the defendant had stated "the house would be easy to loot" and Clayton had relayed this information to Officer Now, both officers had probable cause to believe the defendant with the U-Haul truck was engaged in criminal activity and they had reasonable cause to stop the truck, arrest the defendant, search the van, and inventory its contents without a search warrant. This is particularly confirmed by the defendant's testimony:

"Q   When the deputy looked in the back of the truck, did he indicate—did he say anything?

"A   Only thing I remember him saying was, 'Just what I thought.'

"Q   He said, 'Just what I thought,' when he looked in there?

"A   Yes."

It is further confirmed by the defendant's attempt to

escape from Officers Now and Clayton on Highway 20 near the Toledo junction.

In *State v. Williams,* 253 Or 613, 615, 456 P2d 497 (1969), we stated:

"* * * [W]hen an arrest and search is made without a warrant 'probable cause' or 'reasonable grounds' may be established by evidence of facts and circumstances preceding an arrest that are ' "* * * sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed [in his presence.]' Brinegar v. United States, 338 US 160, 175, 69 S Ct 1302, 93 L ed 1879 [1949]."

In *State v. Cloman,* 254 Or 1, 13, 456 P2d 67 (1969), we held:

"* * * A search incident to an arrest is authorized 'to enable enforcement officers to gather the fruits of the crime, the implements thereof, and possibly to prevent the destruction of evidence thereof.' *State v. Chinn,* 231 Or 259, 267, 373 P2d 392 (1962). * * *" (Search in trunk of car for stolen copper wire.)

This is particularly true of incidents involving searches of automobiles involved in the furtherance of crime. *See State v. Elk,* 249 Or 614, 621, 439 P2d 1011 (1968); *Carroll v. United States,* 267 US 132, 45 S Ct 280, 69 L Ed 543 (1925); *Chambers v. Maroney,* 399 US 42, 90 S Ct 1975, 26 L Ed 2d 419 (1970); *Coolidge v. New Hampshire,* 403 US 443, 481, 91 S Ct 2022, 29 L Ed 2d 564 (1971).

The Court of Appeals rightly affirmed the trial court but inadvertently based the affirmance on their opinion in *State v. Keller, supra.*

Affirmed.

HOLMAN, J., concurring.

The question presented is whether the police had a right to make a warrantless search of defendant's van after he was incarcerated in jail. I concur in the majority opinion because the State carried the burden of proving defendant's consent to the search. The defendant testified:

"A * * * [T]hen he informed me that they would get a search warrant if necessary. * * *

"* * * * *

"A * * * [F]inally I told the officer that they was [sic] going to get a warrant so they had my permission to take an inventory of the truck. * * *"

Having received defendant's consent, the only remaining inquiry is whether the officers had sufficient evidence upon which to secure a warrant. If they did not, defendant consented as the result of a misrepresentation to him. The police had the testimony of Hunt, defendant's acquaintance, that the night before, while in Hunt's vehicle, defendant had cased several houses and talked about how easy it would be to loot them. After receiving this information the police had attempted to apprehend defendant and were successful in doing so, only after a high speed chase involving two police cars. In my opinion, such evidence formed a sufficient basis upon which to secure a warrant to search the truck. The consent was not given as the result of a misrepresentation. *State v. Douglas,* 260 Or 60, 488 P2d 1366 (1971).

DENECKE, J., dissenting.

I dissent from the decision of the majority.

The majority bases its decision upon the grounds that the defendant consented to the search and the

officers had probable cause to arrest for theft and, therefore, the search is justifiable as incident to arrest.

The state seems to have conceded that neither of these grounds were sufficient. The state wrote in its brief:

> "Counsel for defendant devotes the major portion of his appellant's brief to the task of negating the application of a search incident to arrest, search in an emergency situation and consent searches. As the facts clearly demonstrate that none of those search situations is relevant to the present case, which consisted of an inventory search, this brief will be confined to meeting defendant's argument (App Br pp 13-15) that the inventory search was invalid."

I am of the opinion that the state was correct in its concessions; however, the search cannot be validated as an inventory search because the property was in a closed, locked truck, not visible from the outside. The truck is like the fishing tackle box in *State v. Keller*, 265 Or 622, 510 P2d 568 (1973). No reason is shown why the police needed an inventory of the contents of a locked truck.

I am of the opinion that the search cannot be justified as a consent search because the consent was coerced. The defendant did not want the police to unlock the truck; therefore, the defendant hid the key in his boot. After he was in jail and under arrest under a warrant for assault, he refused two requests by the police for his key. He finally "gave in" on the third demand. Under such circumstances I believe there was duress as a matter of law.

Assuming the officers had probable cause to search the truck, there is no showing of any exigent cir-

cumstances to excuse not going to a magistrate and seeking a warrant. At the time of the search the truck was impounded on the courthouse parking lot. It was locked and the defendant had the key.

I am not certain what the state of the law is in our court or in the United States Supreme Court. *Chambers v. Maroney,* 399 US 42, 90 S Ct 1975, 26 L Ed2d 419, reh den 400 US 856, 91 S Ct 23, 27 L Ed2d 94 (1970); *Coolidge v. New Hampshire,* 403 US 443, 91 S Ct 2022, 29 L Ed2d 564, reh den 404 US 874, 92 S Ct 26, 30 L Ed2d 120 (1971); and *Cady v. Dombrowski,* 413 US 433, 93 S Ct 2523, 37 L Ed2d 706 (1973), leave me uncertain about the United States Supreme Court.

Our decision in *State v. McCoy,* 249 Or 160, 437 P2d 734 (1968), is now a doubtful precedent because it purported to follow *United States v. Rabinowitz,* 339 US 56, 70 S Ct 430, 94 L Ed 653 (1950), which was expressly overruled by *Chimel v. California,* 395 US 752, 89 S Ct 2034, 23 L Ed2d 685 (1969). The Oregon Court of Appeals stated that it would probably have held a warrantless search of an automobile brought to the police station to be improper except they were bound by *State v. McCoy,* supra (249 Or 160). *State v. Keith,* 2 Or App 133, 143, 465 P2d 724 (1970).

I believe the most desirable principle to be that when the police have probable cause to search an automobile but there are no circumstances reasonably preventing them from delaying their search until a warrant is sought, a warrant should be a prerequisite.

O'CONNELL, C. J., joins in this dissent.