Argued and submitted October 31, affirmed December 14, 2011, petition for review allowed May 2, 2012 (352 Or 25)

**STATE OF OREGON,**
*Plaintiff-Appellant,*

*v.*

**JESSE JAMES MOORE,**
*Defendant-Respondent.*

Tillamook County Circuit Court
091131; A145081

269 P3d 72

Timothy A. Sylwester, Senior Assistant Attorney General, argued the cause for appellant. With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Marc D. Brown, Deputy Public Defender, argued the cause for respondent. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Duncan, Judge.

HASELTON, P. J.

## HASELTON, P. J.

The state appeals an order suppressing evidence resulting from the warrantless testing of defendant's blood and urine. ORS 138.060(1)(c). The trial court, consistently with the reasoning in our decision in *State v. Machuca*, 231 Or App 232, 218 P3d 145 (2009) (*Machuca I*), *rev'd on other grounds*, 347 Or 644, 227 P3d 729 (2010) (*Machuca II*), concluded that defendant's consent to that testing was involuntary because it was obtained after he had received statutory implied consent warnings about the economic harm and loss of privileges that would result if he refused.[1] On appeal, the state essentially contends that we should abandon our analysis concerning consent in *Machuca I*. For the reasons explained below, we adhere to, and readopt, our reasoning in *Machuca I—viz.*, that a defendant's consent that is obtained after the defendant has received statutory implied consent warnings is involuntary. Accordingly, we affirm.

We take the uncontroverted facts from the testimony of Farrar, the state police trooper who witnessed and investigated the accident that led to the charges against defendant and who was the only witness to testify at the suppression hearing. On the afternoon of September 12, 2008, Farrar witnessed a two-vehicle accident on Highway 101 in Tillamook County. According to Farrar, defendant was driving a northbound vehicle that crossed the center line and collided with a southbound vehicle. The accident injured defendant and caused a fatality.

According to Farrar, when he first saw defendant, "it * * * appear[ed] that he was pinned in the vehicle against the steering wheel and the seat." At some point thereafter, while defendant was lying on a backboard on the shoulder of the road, Farrar spoke with him and noticed that, although "people [who] are involved in crashes are a little more amped up," defendant "was dazed and his speech was slow." However, Farrar did not notice the smell of alcohol when he spoke with defendant.

---

[1] *See generally* ORS 813.100(1) (concerning implied consent for breath or blood tests); ORS 813.131(1) (concerning implied consent for urine test); ORS 813.130 (concerning information about implied consent rights and consequences).

Approximately an hour or two later, after defendant had apparently received pain medication,[2] Farrar talked with defendant again in the emergency room of the local hospital to which defendant had been transported. According to Farrar, defendant "was very drowsy, his speech was slurred and thick, [and] he was in a considerable amount of pain due to the injuries of the crash[.]"

After that conversation, Farrar determined that there was probable cause to believe that defendant had committed the crime of driving under the influence of intoxicants. Farrar advised defendant of his *Miranda* rights, and defendant indicated that he understood them. After asking defendant questions from a standard "alcohol influence interview report," Farrar "read [defendant] the implied consent form and asked him if he'd be willing to give blood and urine samples." Defendant agreed to provide the samples. Defendant was subsequently indicted for criminally negligent homicide. ORS 163.145.

Before trial, defendant moved to suppress "all evidence that resulted from the seizure of the defendant's person, blood[,] and urine, and the results of the tests performed on the samples." At the suppression hearing—which was held approximately one week after the Supreme Court issued its decision in *Machuca II*—the state contended that the motion should be denied because either (1) probable cause and exigent circumstances existed to obtain the evidence without a warrant or (2) defendant had voluntarily consented.

Conversely, defendant contended that the state had not established the existence of exigent circumstances and probable cause. Further, defendant contended that, under our decision in *Machuca I*, his consent was involuntary because it was "only obtained after [he] was given the [statutorily required implied consent] warnings * * * about the consequences of a refusal to allow a blood or urine test," which "threaten an economic harm and loss of privilege."

---

[2] Farrar testified that, while at the hospital, he overheard the hospital staff asking defendant "if the medication was making him feel any better."

The trial court suppressed the evidence because (1) although probable cause existed, the state had failed to satisfy its burden to demonstrate the existence of exigent circumstances and (2) defendant's consent was involuntary. In that regard, the trial court stated that, in *Machuca I*, we had "held that the implied consent warnings were inherently coercive" and that our resolution of that issue survived the Supreme Court's reversal in *Machuca II*. Ultimately, noting that the facts of this case were materially indistinguishable from those in *Machuca*, the court granted defendant's motion to suppress the evidence "based upon * * * *Machuca [I]*." The state appeals the trial court's resulting order.

On appeal, the state does not challenge the trial court's determination that exigent circumstances had not been established—and, thus, that the "probable cause and exigent circumstances" exception to the warrant requirement is inapposite. Instead, the state's fundamental contention is that

> "[t]he circuit court erred when it suppressed evidence of blood and urine samples that the trooper obtained from defendant pursuant to his express consent. Defendant's consent was not rendered constitutionally invalid merely because the trooper who obtained that consent had correctly advised him of the rights and adverse consequences in accordance with the implied-consent provisions in ORS 813.100(1) and ORS 813.131(1)."

In support of that contention, the state raises essentially the same arguments that were addressed by this court in *Machuca I*—many of which were articulated in the dissenting opinion in that case. *See Machuca I*, 231 Or App at 247-51 (Haselton, J., dissenting). In other words, the state is requesting that we revisit our reasoning in *Machuca I* concerning the involuntariness of a defendant's consent after the defendant had been advised of the statutorily prescribed implied consent warnings. For the reasons explained below, we decline the state's invitation.

In *Machuca I*, we concluded that the trial court erred in denying the defendant's motion to suppress because (1) the state had failed to meet its burden to prove that exigent circumstances existed and (2) the defendant's consent was

involuntary for purposes of Article I, section 9, of the Oregon Constitution.[3] Specifically, with regard to the issue of consent, we reasoned:

"In reviewing the voluntariness of a person's consent to a search, '[w]e are not bound by the trial court's ultimate holding as to voluntariness, * * * [but] assess anew whether the facts suffice to meet constitutional standards.' *State v. Stevens*, 311 Or 119, 135, 806 P2d 92 (1991). The proper test for voluntariness is whether, under the totality of the circumstances, the consent was given by an act of free will or was the result of coercion, express or implied. *State v. Dimeo*, 304 Or 469, 474, 747 P2d 353 (1987); *State v. Wolfe*, 295 Or 567, 572, 669 P2d 320 (1983). The state bears the burden of proving voluntariness by a preponderance of the evidence. *State v. Paulson*, 313 Or 346, 351-52, 833 P2d 1278 (1992).

"The relevant factors to be considered in determining the voluntariness of consent include (1) whether physical force was used or threatened; (2) whether weapons were displayed; (3) whether the consent was obtained in public; (4) whether the person who gives consent was the subject of an investigation; (5) the number of officers present; (6) whether the atmosphere surrounding the consent was antagonistic or oppressive; and (7) whether drug or alcohol use has impaired the defendant's ability to make a knowing, voluntary, and intelligent choice. *State v. Larson*, 141 Or App 186, 198, 917 P2d 519, *rev den*, 324 Or 229 (1996).

"Some of those factors suggest that defendant's consent was not voluntary. Defendant gave consent after he was placed under arrest, shortly after being injured in an automobile accident, and while under the influence of alcohol. On the other hand, defendant's assent did not result from the use of physical force or the display of weapons. What is determinative in this context, however, is that the consent was procured through a threat of economic harm and loss of privileges. It was obtained only after defendant was given

---

[3] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

the warnings required by ORS 813.130(2) about the conse-
quences of a refusal to allow a blood test. Under *State v.
Newton*, 291 Or 788, 801, 636 P2d 393 (1981), *overruled in
part on other grounds by State v. Spencer*, 305 Or 59, 750
P2d 147 (1988), a consent to search obtained in that fashion
is coerced by the fear of adverse consequences and is inef-
fective to excuse the requirement to obtain a search
warrant."

*Machuca I*, 231 Or App at 239-40 (omission and brackets in
*Machuca I*).

In *Machuca II*, the Supreme Court concluded that
the state had demonstrated the existence of exigent circum-
stances and that our analysis to the contrary was erroneous.
The Supreme Court's conclusion in that regard obviated the
need for the court to address our analysis concerning the
defendant's consent—and the court explicitly said as much.
Specifically, the Supreme Court stated, "[W]e need not deter-
mine whether defendant's consent was valid under Article I,
section 9, nor do we need to determine whether the Court of
Appeals correctly interpreted and relied on the plurality
opinion in *Newton*." *Machuca II*, 347 Or at 657. In sum,
although the Supreme Court reversed our decision in
*Machuca I*, the court did not call into question, much less
abrogate, our analysis concerning the defendant's consent.

As noted, the state now urges us to revisit that
analysis. However, important prudential and institutional
principles—many of which find their origin in the doctrine of
*stare decisis*—compellingly militate otherwise. As the
Supreme Court recently explained in *Farmers Ins. Co. v.
Mowry*, 350 Or 686, 697-98, 261 P3d 1 (2011),

"*stare decisis* is a prudential doctrine that is defined by the
competing needs for stability and flexibility in Oregon law.
Stability and predictability are important values in the law;
individuals and institutions act in reliance on this court's
decisions, and to frustrate reasonable expectations based
on prior decisions creates the potential for uncertainty and
unfairness. Moreover, lower courts depend on consistency
in this court's decisions in deciding the myriad cases that
come before them. Few legal principles are so central to our
tradition as the concept that courts should treat like cases
alike, and *stare decisis* is one means of advancing that goal.

> For those reasons, we begin with the assumption that issues considered in our prior cases are correctly decided, and the party seeking to change a precedent must assume responsibility for affirmatively persuading us that we should abandon that precedent. We will not depart from established precedent simply because the personal policy preferences of the members of the court may differ from those of our predecessors who decided the earlier case."

(Internal quotation marks, brackets, citations, and footnote omitted.) To be sure, because *Machuca I* was subsequently reversed, albeit on different grounds, our decision there is not literally controlling precedent. Nevertheless, the prudential principles emphasized in *Farmers Ins. Co.* compellingly militate in favor of our continued adherence to the core reasoning of *Machuca I*.

We are especially mindful that, as an institutional matter, we are not well served to revisit an analysis recently adopted by a majority of the full court. That is so, particularly, where, as here, the state does not contend that there has been an intervening change in the law or that our reasoning was "plainly wrong." *See Newell v. Weston*, 156 Or App 371, 380, 965 P2d 1039 (1998) (reasoning that this court would adhere to its precedent unless it is plainly wrong). To revisit and repudiate *Machuca I*, especially given the intervening changes in the court's composition, could engender a perception that we have done so merely "because the personal policy preferences of the members of the court * * * differ from those of our predecessors who decided the earlier case." *Farmers Ins. Co.*, 350 Or at 698 (internal quotation marks and brackets omitted). That, in turn, could subvert public confidence in the integrity of our processes—the ultimate source of any court's authority. *See generally* Alexander Bickel, *The Least Dangerous Branch* (1962). Accordingly, we adhere to our reasoning in *Machuca I* concerning the issue of consent and readopt it here.

Applying that reasoning to the facts of this case, which are materially indistinguishable from those in *Machuca I*, we conclude that defendant's consent was involuntary. Here, defendant consented after receiving the implied consent warnings. As we reasoned in *Machuca I*, "a consent to search obtained in that fashion is coerced by the

fear of adverse consequences and is ineffective to excuse the requirement to obtain a search warrant." 231 Or App at 240. Thus, the trial court did not err in granting defendant's motion to suppress.[4]

Affirmed.

---

[4] Our disposition obviates the need to consider defendant's alternative bases for affirmance—*viz.*, (1) that "ORS 813.100 does not apply because the officer's belief that he had probable cause to arrest defendant for driving under the influence of a controlled substance was not objectively reasonable" and (2) that "[d]efendant did not voluntarily consent to the search because he had received pain medication prior to being asked to give consent."