Argued and submitted September 6, 2012, resubmitted January 7, decision of Court of Appeals reversed; order of circuit court reversed, and case remanded to the circuit court for further proceedings December 12, 2013

## STATE OF OREGON,
*Petitioner on Review,*

*v.*

## JESSE JAMES MOORE,
*Respondent on Review.*

## (CC 091131; CA A145081; SC S060134)

318 P3d 1133

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause for petitioner on review. With him on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Peter Gartlan, Chief Defender, Office of Public Defense Services, Salem, argued the cause and filed the brief for respondent on review.

BALMER, C. J.

Kistler, J., concurred in part and concurred in the judgment and filed an opinion in which Walters, J., joined.

## BALMER, C. J.

In this criminal case, defendant was charged with criminally negligent homicide after he allegedly drove while under the influence of intoxicants and struck another vehicle, killing one of its occupants. During the investigation of the crime, a police officer read defendant the statutory implied consent warnings as required by ORS 813.100(1) and ORS 813.130,[1] and defendant agreed to provide blood and urine samples. Before trial, defendant moved to suppress the test results from those samples, arguing that his consent was involuntary because it was obtained after he had been warned of the legal consequences he would suffer if he refused consent. The trial court, considering itself bound by the Court of Appeals decision in *State v. Machuca*, 231 Or App 232, 218 P3d 145 (2009) (*Machuca I*), *rev'd on other grounds*, 347 Or 644, 227 P3d 729 (2010) (*Machuca II*), concluded that defendant's consent was involuntary. Accordingly, the trial court suppressed the blood and urine evidence because it was obtained in violation of defendant's right under Article I, section 9, of the Oregon Constitution to be free from unreasonable searches and seizures.[2] The state filed an interlocutory appeal of that pretrial order, and the Court of Appeals affirmed the trial court's ruling. *State v. Moore*, 247 Or App 39, 269 P3d 72 (2011). We allowed the state's petition for review.

As we explain below, we conclude that defendant's consent was voluntary; the police officer did not unconstitutionally coerce defendant's consent to the test of his blood and urine by reading him the statutory implied consent warnings. We therefore reverse the decision of the Court of Appeals and the ruling of the trial court.

The following facts are undisputed for purposes of this proceeding. On September 12, 2008, Oregon State Trooper Farrar witnessed an accident while driving southbound on Highway 101 in Tillamook County. He observed defendant drift over the center line and collide head-on with

---

[1] We quote and discuss those statutes later in this opinion.

[2] Defendant did not argue to the trial court and does not argue here that his consent was involuntary under the Fourth Amendment, and we do not consider that issue further.

another vehicle. The collision injured defendant and killed a woman in the other vehicle. A few minutes later, Farrar conducted a brief interview with defendant at the scene of the collision, while defendant was receiving medical treatment before being transported to the hospital. During that conversation, after noticing that defendant was dazed and his speech was slow, Farrar began to suspect that defendant had been driving under the influence of intoxicants.

An hour or two later, Farrar went to the hospital and again interviewed defendant as he recovered in the emergency room. By that time, Farrar believed that he had probable cause to arrest defendant for DUII. Farrar provided defendant *Miranda* warnings and also advised him of his rights under Oregon's implied consent law and the adverse consequences of refusing to provide samples of his breath, blood, or urine. He did so by reading the warnings set out on an "implied consent" form prepared by the Driver and Motor Vehicle (DMV) Services Division of the Oregon Department of Transportation. That form generally tracks the statutorily required warnings of ORS 813.130, which we discuss below. Farrar then asked defendant to consent to provide a sample of his blood and urine. Defendant orally consented, stating, "Of course," and provided the requested samples. Those samples apparently disclosed the presence of controlled substances.[3]

As noted, defendant was charged with criminally negligent homicide. Before trial, defendant moved to suppress evidence obtained through the warrantless seizure of his blood and urine, arguing that no exigent circumstances existed to justify the warrantless search and that his consent was coerced and not voluntary.[4] The trial court granted the motion. The trial court found that there was no evidence in the record concerning the evanescent nature of drugs in defendant's system that might require his blood or urine to be tested promptly. There also was no evidence that Farrar

---

[3] The trial court observed that, at the time of the suppression hearing, there was no evidence in the record of the particular drugs found in defendant's blood or urine.

[4] Defendant also moved to suppress evidence found in a warrantless search of his car. The state conceded error with respect to that motion and it is not at issue here.

could not have expeditiously obtained a warrant. For those reasons, the court ruled that the state had failed to prove that exigent circumstances existed to justify the warrantless seizure of defendant's blood and urine.[5] The trial court then considered whether defendant's consent to the seizure of his blood and urine was voluntary. The court noted that, apart from the fact that Farrar had read defendant the statutorily required warnings of the consequences of refusing to submit to blood and urine tests, there was no indication that defendant's consent had been coerced. Accordingly, the trial court stated:

> "Absent the effect of the implied consent warnings, the Court would find that the Defendant's consent to the blood draw was given voluntarily."

However, the court concluded, it was bound by the Court of Appeals' holding in *Machuca I* that implied consent warnings are inherently coercive, because they induce consent through a threat of economic harm and loss of privileges resulting from the failure to consent. The trial court

---

[5] This court's case law suggests that evidence of the evanescent nature of blood-*alcohol* evidence or the time it would take to obtain a warrant is not necessary in most cases to establish the existence of exigent circumstances under Article I, section 9, of the Oregon Constitution:

> "[F]or purposes of the Oregon Constitution, the evanescent nature of a suspect's blood alcohol content is an exigent circumstance that will ordinarily permit a warrantless blood draw of the kind taken here. * * * [However,] particular facts may show, in the rare case, that a warrant could have been obtained and executed *significantly* faster than the actual process otherwise used under the circumstances. We anticipate that only in those rare cases will a warrantless blood draw be unconstitutional."

*Machuca II*, 347 Or at 657 (emphasis in original). That holding remains good law. This case, however, involves driving under the influence of controlled substances, rather than alcohol, and, as noted, the record contains no evidence of the dissipation rates for any controlled substances that might have been found in defendant's system.

While this case was pending in this court, the United States Supreme Court, in *Missouri v. McNeely*, 569 US ___, 133 S Ct 1552, 185 L Ed 2d 696 (2013), rejected the argument that, under the Fourth Amendment to the United States Constitution, the natural metabolism of alcohol in the bloodstream presents a *per se* exigency that always justifies an exception to the warrant requirement. Rather, according to the Court, exigency in the context of an arrest for DUII must be determined case by case based on the totality of the circumstances. 133 S Ct at 1563; 185 L Ed 2d at 709. In our view, the Court's rejection of a *per se* exigency rule is not inconsistent with our statement in *Machuca II* that, while exigent circumstances are "ordinarily" present in a case involving alcohol, that may not be true, depending on the facts of a particular case.

observed that, although this court had reversed the Court of Appeals decision in *Machuca I*, it had done so based on the state's argument that exigent circumstances—the dissipation of the blood-alcohol evidence—justified the warrantless search. In reversing on that basis, this court in *Machuca II* expressly declined to determine whether a defendant's consent after receiving the implied consent warnings was valid under Article I, section 9, of the Oregon Constitution. For that reason, the trial court concluded, the Court of Appeals decision on voluntariness was binding.

The state appealed the trial court order suppressing evidence, arguing that defendant validly consented to the taking of his blood and urine. The state did not challenge the trial court's ruling that there was no evidence of exigent circumstances. The Court of Appeals affirmed, concluding that this court's decision in *Machuca II* "did not call into question, much less abrogate, our analysis [in *Machuca I*] concerning defendant's consent." 247 Or App at 45. The court acknowledged that its opinion in *Machuca I* "is not literally controlling precedent," *id.* at 46, given that this court reversed it on other grounds, but the Court of Appeals nonetheless applied the doctrine of *stare decicis* and affirmed:

> "[Because] the facts of this case * * * are materially indistinguishable from those in *Machuca I*, we conclude that defendant's consent was involuntary. Here, defendant consented after receiving the implied consent warnings. As we reasoned in *Machuca I*, 'a consent to search obtained in that fashion is coerced by the fear of adverse consequences and is ineffective to excuse the requirement to obtain a search warrant.' 231 Or App at 240. Thus, the trial court did not err in granting defendant's motion to suppress."

*Id.* at 46-47 (footnote omitted).

Before we turn to the parties' arguments in this case, we set out a brief description of Oregon's implied consent law. As part of the state's effort to deter persons from driving after drinking, ORS 813.010 creates the crime of driving under the influence of intoxicants. That statute provides, in part:

> "(1) A person commits the offense of driving while under the influence of intoxicants if the person drives a vehicle while the person:

"(a)  Has 0.08 percent or more by weight of alcohol in the blood of the person as shown by chemical analysis of the breath or blood of the person made under ORS 813.100, 813.140 or 813.150;

"(b)  Is under the influence of intoxicating liquor, a controlled substance or an inhalant; or

"(c)  Is under the influence of any combination of intoxicating liquor, an inhalant and a controlled substance."

Additionally, ORS 813.100(1) provides that anyone operating a vehicle in Oregon is deemed to have consented to a chemical test of the alcohol content of his or her breath, and in certain circumstances blood, if he or she is arrested for driving while intoxicated. ORS 813.100(1) provides:

"Any person who operates a motor vehicle upon premises open to the public or the highways of this state *shall be deemed to have given consent*, subject to the implied consent law, *to a chemical test of the person's breath, or of the person's blood if the person is receiving medical care in a health care facility immediately after a motor vehicle accident*, for the purpose of determining the alcoholic content of the person's blood if the person is arrested for driving a motor vehicle while under the influence of intoxicants in violation of ORS 813.010 or of a municipal ordinance. A test shall be administered upon the request of a police officer having reasonable grounds to believe the person arrested to have been driving while under the influence of intoxicants in violation of ORS 813.010 or of a municipal ordinance. Before the test is administered the person requested to take the test shall be informed of consequences and rights as described under ORS 813.130."

(Emphases added.) Similarly, any person who operates a motor vehicle in Oregon is deemed to have consented to a test of his or her urine in certain circumstances:

"Any person who operates a motor vehicle upon premises open to the public or the highways of this state shall be deemed to have given consent, subject to the Motorist Implied Consent Law, to a chemical test of the person's urine for the purpose of determining the presence of a controlled substance or an inhalant in the person's body if the person is arrested for driving while under the influence of intoxicants in violation of ORS 813.010 or of a municipal

ordinance and * * * [t]he person is involved in an accident resulting in injury or property damage. * * *"

ORS 813.131(1)(b). And, under ORS 813.132, "a refusal to take a urine test requested under ORS 813.131 shall be treated for all purposes as a refusal to take a breath test."

ORS 813.130 sets out a lengthy statement of rights and adverse consequences related to breath and blood tests for drivers that must be read to a driver before an officer administers a breath or blood test to determine the driver's intoxication level. Those consequences include the immediate confiscation of the driver's license, suspension of driving privileges, ineligibility for a hardship permit for up to three years, and a fine. ORS 813.130(2)(c), (d), (e), and (f). In addition, ORS 813.130(2)(a) requires the officer to warn the driver that, "[i]f a person refuses a test or fails, evidence of the refusal or failure may also be offered against the person." Finally, a refusal to take a breath or urine test is a "specific fine traffic violation" under ORS 813.095.

On review in this court, the state asserts that the police officer in this case accurately read defendant the statement of the rights and consequences of refusing to provide blood and urine samples required by ORS 813.130, and defendant consented. The state argues that, as a matter of law, a police officer does not coerce a defendant into submitting to the statutorily required tests when the officer gives the defendant accurate information about the lawful adverse consequences that might result from a refusal. Thus, the state asserts, to the extent that the Court of Appeals held otherwise in its decisions in *Machuca I* and in this case, it was wrong. The state argues, alternatively, that, under the implied consent statutes, defendant prospectively gave his consent to the search and seizure of his blood and urine when he chose to drive on public roads in Oregon. ORS 813.100(1); ORS 813.131(1) (driver is "deemed to have given consent" to chemical tests of blood and urine when he or she "operates a motor vehicle upon premises open to the public or the highways of this state"). We do not reach the state's alternative argument. Rather, for purposes of this opinion, we assume without deciding that it would be unconstitutional to "deem" defendant to have consented when he drove. As we explain

below, we conclude that defendant expressly and voluntarily consented when Farrar asked him to submit to the tests and that he was not coerced by the statement of rights and consequences that Farrar read to him before seeking consent.

We begin with the state's argument that the trial court and the Court of Appeals erred in relying on the Court of Appeals decision in *Machuca I* to conclude that defendant's consent to the seizure of his blood and urine was coerced. The Court of Appeals based its conclusion in *Machuca I* that consent procured by reading a driver the statement of rights and adverse consequences related to breath and blood tests required by ORS 813.130 is involuntary on a statement to that effect in a plurality opinion in *State v. Newton*, 291 Or 788, 636 P2d 393 (1981):

> "Where a person's consent to a seizure is solicited, and the person consents only after being warned that he will suffer a substantial penalty if he refuses, the resulting consent cannot be regarded as a free exercise of will. We therefore hold that defendant's submission to the breath test was not a voluntary consent to seizure because it was coerced."

*Id.* at 801.

We do not fault the Court of Appeals for relying on that pronouncement in *Newton*, but, on reflection, we conclude that the passage quoted above should not be followed, for at least three reasons. First, the statement was made in a three-justice plurality opinion, not a majority opinion. The concurring opinion joined in the plurality's conclusion that the warrantless seizure of the defendant's breath was lawful based on probable cause and exigent circumstances; it did not expressly or necessarily join the plurality in its statement concerning consent. It follows that the statement in *Newton* that consent procured by threatening adverse consequences of refusal is not binding authority.

Second, the statement in *Newton* about the validity of the defendant's consent in that case was at odds with this court's cases holding that a police officer's accurate statement of the potential lawful adverse consequences resulting from a refusal ordinarily cannot be deemed to unlawfully coerce a defendant's consent to a search or seizure. As this

court stated in *State v. Hirsch*, 267 Or 613, 622, 518 P2d 649 (1974):

> "'The officer's threat that he would obtain a warrant if defendant did not consent to the search did not constitute the kind of coercion that renders a search involuntary. Concededly such a threat may be coercive in the sense that an accused would not have consented to the search in the absence of the threat. *But not all coercion inducing consent to a search is constitutionally impermissible. If the officers threaten only to do what the law permits them to do, the coercion that the threat may produce is not constitutionally objectionable.*'"

(Emphasis added; quoting with approval Chief Justice O'Connell's observation, dissenting on other grounds, in *State v. Douglas*, 260 Or 60, 81, 488 P2d 1366 (1971)); *see also State v. Williamson*, 307 Or 621, 627, 772 P2d 404 (1989) (Carson, J., concurring) (to same effect).[6]

The plurality opinion in *Newton* did not engage in any legal analysis before stating that a person's consent after learning of a substantial penalty for refusing to do so is not an exercise of free will. Neither did the opinion consider whether the driver had a statutory right to refuse to submit to the seizure of his breath, blood, or urine or whether the consequences that the statute imposed for refusal were lawful; indeed, the plurality concluded elsewhere in the opinion that one does not have a statutory right to refuse. 291 Or at 792 (the implied consent statute "removes the right of a licensed driver to lawfully refuse").

Moreover, it is difficult to see why the disclosure of accurate information about a particular penalty that may be imposed—if it is permissible for the state to impose that penalty—could be unconstitutionally coercive. Rather, advising a defendant of the lawful consequences that may flow from his or her decision to engage in a certain behavior

---

[6] The concurring opinion argues that the quoted statement from *Hirsch* may be problematic and that some threats to do "what the law permits" may, in fact, be coercive, while some threats of consequences that are legally impermissible may not be coercive. Here, however, neither party has presented a developed argument that we should reconsider the rule stated in *Hirsch*, and we decline to do so. We agree with the concurring opinion that any reconsideration of the statement from *Hirsch* quoted in the text should be undertaken based only on thorough briefing in an appropriate case.

ensures that that defendant makes an informed choice whether to engage in that behavior or not. Indeed, the *failure* to disclose accurate information regarding the potential legal consequences of certain behavior would seem to be a more logical basis for a defendant to assert that his or her decision to engage in that behavior was coerced and involuntary. Of course, accurately advising a defendant of a lawful penalty that could be imposed may well play a role in the defendant's decision to engage in the particular behavior, but that does not mean that the defendant's decision was "involuntary." For those reasons, we decline to follow the *Newton* plurality's conclusory statement that consent to a seizure is necessarily involuntary if it is obtained after a defendant has been advised of the consequences of refusing.

Notwithstanding our agreement with the state's primary argument—that the officer's reading of the statutory rights and consequences of refusing to submit to the tests was not necessarily coercive—our inquiry is not at an end. Before this court, defendant does not seriously contend that a statement of the *lawful* consequences of refusal is unconstitutionally coercive. Rather, defendant's primary argument is that the implied consent warnings include at least one consequence of refusal that is *not* lawful, at least not in all circumstances, because it is unconstitutional. Defendant argues that, whatever the implied consent statute may say about the matter, a driver has the *constitutional* right to refuse to consent to a seizure of his bodily fluids under Article I, section 9, of the Oregon Constitution and, as a matter of constitutional law, the assertion of a constitutional right may not be used as substantive evidence of guilt. That is, defendant argues, a person may not be put in a position where the only options are to produce physical evidence when he or she has the constitutional right not to produce that evidence or to refuse the request and have the refusal be used against him or her as evidence of guilt.[7]

---

[7] Moreover, defendant argues, even if, under ORS 813.100 and ORS 813.131, a driver is "deemed" to have consented to a test of his breath, blood, and urine whenever the driver takes to the road, that consent remains revocable. According to defendant, the legislature lacks authority to divest individuals of the constitutional right to revoke consent. As we have stated, we do not reach the state's argument that defendant impliedly consented to the seizure of his blood or urine

Specifically, defendant argues that ORS 813.310, which provides that evidence of a person's refusal to submit to chemical tests of his or her breath or blood is admissible in any civil or criminal action, violates those constitutional principles by expressly making the assertion of the constitutional right to refuse consent admissible against the driver in a criminal prosecution.[8] According to defendant, ORS 813.310 is unconstitutional because the assertion of one's constitutional right to refuse consent to a warrantless search may not be used as evidence of guilt. It follows, he argues, that "the *threat* in ORS 813.130(2)(a) to use the refusal as evidence conflicts with constitutional law," and renders his consent involuntary as a matter of law.[9]

The question here, however, is not whether ORS 813.310 is unconstitutional in providing that "evidence of the person's refusal [to submit to a chemical test under ORS 813.100] is admissible in any civil or criminal action, suit or proceeding arising out of acts committed while the person was driving" while intoxicated. For purposes of analysis, we will assume, *arguendo*, that defendant is correct that, at least under some circumstances, use of evidence of defendant's refusal against him would violate his Article I, section 9, right to be free from unreasonable searches or seizures. Nor is the question here whether defendant's consent could be considered involuntary, rather than voluntary, if Farrar had stated the consequences of a refusal to consent in terms of ORS 813.310—that is, if Farrar had warned defendant that if he refused to consent, then his refusal "is admissible in any civil or criminal action" arising from his

when he drove on public roads in Oregon. For that reason, we also need not decide whether any such implied consent was revocable.

[8] ORS 813.310 provides:

"If a person refuses to submit to [chemical tests] ***, evidence of the person's refusal is admissible in any civil or criminal action, suit or proceeding arising out of acts alleged to have been committed while the person was driving *** while under the influence of intoxicants."

[9] Defendant does not argue that his consent was, in fact, coerced by the threat that refusal would be used against him in his subsequent criminal case. And, as noted, the trial court found that, "[a]bsent the effect of the implied consent warnings, the Court would find that the Defendant's consent to the blood draw was given voluntarily."

driving while intoxicated. As noted, we assume for purposes of analysis (but do not decide) that such a refusal may be inadmissible in some circumstances, and therefore a statement by the officer that the refusal "is admissible" would be inaccurate.

Here, however, Farrar did *not* state the consequence of defendant's refusal by quoting or summarizing ORS 813.310, which expressly provides that the refusal to consent is admissible in any criminal or civil action. Rather, as discussed, he gave the more nuanced, conditional warning that is required by ORS 813.130(2)(a): "If you refuse or fail a test, evidence of the refusal or failure may be offered against you." Thus, the narrow question presented in this case is whether *that* statement rendered defendant's consent to the seizure of his blood and urine involuntary.

In reviewing the voluntariness of a defendant's consent to a search, we consider whether, under the totality of the circumstances, the consent was given by an act of free will or was the result of coercion, express or implied. *State v. Wolfe*, 295 Or 567, 572, 669 P2d 320 (1983) (so holding). The trial court's findings of fact are binding on appeal if there is evidence in the record to support them, but, ultimately, whether consent was voluntary is a question of law, and appellate courts are not bound by the trial judge's conclusion as to the voluntariness of a consent to search. *State v. Parker*, 317 Or 225, 230-31, 855 P2d 636 (1993).

Farrar's statement to defendant differs from the terms of ORS 813.310—the statute that defendant argues is unconstitutional in some circumstances—in several important respects. First, it does not convey certainty that evidence of refusal *will* be used against a driver. Rather, it informs the driver that the evidence *"may"* be offered. Second, it does not inform the driver that the refusal will be *admissible*; rather, it states only that such evidence may be *offered*. Third, it does not refer to a criminal action, or, indeed, any particular type of action at all. The statement actually read to defendant thus does not express or imply that evidence of his refusal will be used or can be used as substantive evidence against him in a criminal proceeding—only that it

"may be offered against [him]." Moreover, it is incontrovertible that a driver's refusal to submit to chemical tests lawfully may be used against him or her in at least two noncriminal proceedings. Under ORS 813.410, a driver who receives notice that his or her driving privileges will be suspended based on the refusal or failure to submit to chemical tests for intoxication has a right to an administrative hearing on the validity of the suspension. The driver's refusal to submit to the tests is relevant evidence to prove the validity of the suspension and, thus, lawfully could be offered against him or her at that hearing. Additionally, under ORS 813.095, the refusal to consent to a chemical test is a specific fine traffic violation. If the driver chooses to contest the violation, the refusal would be admissible in the ensuing proceeding.

It follows that advice that evidence of the refusal or failure "*may* be offered against you" is a true statement, and it advises of a consequence that the constitution does not forbid in at least two situations. That statement was not coercive. Defendant has not objected to the legality of any of the other consequences that would flow from a refusal to submit to the tests, nor has he argued that Farrar's statements to him regarding any of them were coercive in any particular respect.

The advice of rights and consequences that Farrar read to defendant contained accurate statements of the lawful consequences of refusing to submit to the tests. Defendant agreed to and did provide blood and urine samples after Farrar informed defendant of those consequences of refusing, and the trial court found that his consent "was given voluntarily," except for the legal effect of the implied consent warnings as the Court of Appeals had held in *Machuca I*. We have rejected the legal analysis in *Machuca I* for the reasons set out above. Accordingly, we conclude that defendant's consent to provide blood and urine samples to be tested for intoxicants was voluntary and that the trial court's suppression of the results of those tests was error.

The decision of the Court of Appeals is reversed. The order of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**KISTLER, J.,** concurring in part and concurring in the judgment.

After an officer stopped defendant for driving under the influence of intoxicants (DUII), he asked defendant to consent to a blood draw and also advised him of the consequences of refusing to consent. As the majority notes, the officer told defendant that, if he refused to consent to a blood draw, his driving privileges would be suspended, he would not be eligible for a hardship permit for up to a year, he would be subject to a fine, and "evidence of the refusal * * * may be offered against [him]." Having consented, defendant now seeks to suppress the results of the blood draw on the ground that the consequences the officer told him rendered his consent involuntary. As defendant notes, the legislature imposed those consequences to give drivers an incentive to consent, *see State v. Machuca*, 347 Or 644, 658-59, 227 P3d 729 (2010), and one might have thought that the question on review would be whether the consequences the officer identified were so onerous that, in light of the available alternatives, defendant had no real choice.

Defendant, however, has focused on a different proposition. In arguing that the officer's advice rendered his consent involuntary, defendant reasons that the consequences that the officer identified were unconstitutionally coercive because one of those consequences was not legally permissible. He contends that, contrary to what the officer told him, evidence of his refusal to consent to a blood draw could not constitutionally be introduced in a criminal proceeding to prove that he was guilty of DUII.

In responding to that issue, the majority explains that the officer did not advise defendant that his refusal would be admissible in a criminal proceeding to prove that he was guilty of DUII. Rather, the officer advised defendant, somewhat more innocuously, "[i]f you refuse or fail a test, evidence of the refusal or failure may be offered against you." The majority reasons that that advice was accurate. At a minimum, defendant's refusal could be introduced in a civil proceeding to suspend his license for refusing to consent. I do not disagree with the majority's answer to the issue on which defendant has focused his argument, and I also agree

with the majority that the holding in *Missouri v. McNeely*, 569 US ___, 133 S Ct 1552, 185 L Ed 2d 696 (2013) (dissipation of blood alcohol does not establish a *per se* exigency), is quite narrow.

I part company from the majority in one respect. In offering an alternative explanation of why the plurality opinion in *State v. Newton*, 291 Or 788, 636 P2d 393 (1981), is not controlling, the majority notes that the plurality's reasoning in *Newton* is inconsistent with a proposition stated in an earlier case, *State v. Hirsch*, 267 Or 613, 518 P2d 649 (1974). *See* 354 Or at 501-02. The majority summarizes that proposition as follows: "[A] police officer's accurate statement of the potential lawful adverse consequences resulting from a refusal ordinarily cannot be deemed to unlawfully coerce a defendant's consent to a search or seizure." *Id.* In my view, the precedential value of the proposition that the majority takes from *Hirsch* is subject to debate. That proposition finds its source in a 1971 dissent and, three years later, makes a fleeting and somewhat ambiguous appearance in the majority opinion in *Hirsch*.[1] Beyond that, the proposition the majority draws from *Hirsch* either proves too much or nothing at all.

The proposition stated in *Hirsch* arose initially in the context of a debate over the coercive effect of an officer's statement that, if the defendant did not consent to a search, the officer either would get or would try to get a warrant. *See State v. Douglas*, 260 Or 60, 63, 488 P2d 1366 (1971). After canvassing the differing legal views on that question, the majority opinion in *Douglas* concluded that it need not decide whether either formulation of the officer's statement unconstitutionally coerced the defendant's decision to consent; it held that the defendant's decision was prompted by what his brother-in-law had told him, not by anything that the officer may have said about getting or trying to get a warrant. *Id.* at 78-79.

The dissent took a different approach. It would have held that, even if the officer had told the defendant that he

---

[1] Fourteen years after *Hirsch*, a modified form of the proposition resurfaced in a concurring opinion reflecting the views of only one justice. *See State v. Williamson*, 307 Or 621, 626-27, 772 P2d 404 (1989) (Carson, J, concurring).

would get a warrant, that statement was not unconstitutionally coercive. The dissent reasoned:

> "[N]ot all coercion inducing consent to a search is constitutionally impermissible. If the officers threaten only to do what the law permits them to do, the coercion that the threat may produce is not constitutionally objectionable."

*Id.* at 81 (O'Connell, C. J., dissenting). One other judge joined that dissent. *See id.* at 80 (Holman, J., concurring) (agreeing in part with the dissenting opinion). Whatever its merits, that part of the dissent drew only two votes.

Three years later, the statement from the dissenting opinion in *Douglas* appeared in the majority opinion in *Hirsch. See* 267 Or at 622. The majority explained in *Hirsch* that one of the questions in that case was whether the defendant voluntarily consented to an inventory search of his van after an officer told him "'that they would get a search warrant if necessary.'" *Id.* at 621 (quoting the defendant's version of the conversation). In setting out the applicable legal principles, the court stated:

> "For the effect on an otherwise voluntary consent preceded by a statement that the officers would 'get a warrant,' *see State v. Douglas*, 260 Or 60, 488 P2d 1366 (1971), for a complete discussion of conflicting rules."

*Id.* at 622. The court then quoted part of the majority decision in *Douglas*, noted that the officers in *Hirsch* had "good cause and sufficient grounds for securing a warrant," and then quoted part of the dissenting opinion in *Douglas*, which is quoted above. *Id.*

Having set out those legal principles, the court concluded:

> "Under the facts and circumstances of this case, we hold that there was sufficient evidence to support the trial court's denial of the motion to suppress and that the consent given by the defendant was voluntary, uninfluenced by the conduct of the police officers. The trial court, in denying the motion to suppress, was entitled to believe the officers— that the defendant consented to the inventory of the van's contents. The defendant was given Miranda pre-interrogation warnings on three occasions before the consent was

obtained. Assuming that there is a conflict in the testimony between the defendant and the officers on the question of voluntary consent, we will not disturb the trial court's ruling because the issue is one of fact."

*Id.*[2]

The principle on which *Hirsch* rests is far from clear. The majority may have relied on the statement from the dissenting opinion in *Douglas*, which it quoted. *See id.* The majority may have relied on a statement from the majority opinion in *Douglas*, which it also quoted. *See id.* The majority may have relied on one of the authorities discussed in *Douglas*, to which it referred the reader. *See id.* Or the majority may have resolved the case on the basis of some unidentified and unexplained factual finding that was bound up in the trial court's ruling denying the defendant's motion to suppress, as the majority's reasoning suggests. *See id.* It is true that *Hirsch* quotes part of the dissenting opinion in *Douglas*. However, the role that that quotation played in the holding in *Hirsch* is sufficiently uncertain that, in my view, the proposition remains open for consideration.[3]

Considered on its own merits, the proposition from *Hirsch* seems problematic. It is difficult to say that no lawful sanction imposed for refusing to consent can ever be unconstitutionally coercive. Suppose that the legislature provided that, if an officer had probable cause to believe a suspect was driving under the influence and if the suspect refused to consent to a blood draw, the suspect would lose his driving privileges permanently or the suspect's vehicle would be forfeited or both those sanctions would be imposed. Those consequences would be lawful in the sense that the legislature imposed them for refusing to consent; yet, it is difficult to argue that the severity of those consequences would

---

[2] The quotation from *Hirsch* sets out the majority's reasoning in its entirety.

[3] Even if the majority in *Hirsch* intended to endorse the statement from the dissent in *Douglas*, a proposition that seems uncertain to me, the question that remains is whether the statement from the dissent in *Douglas* is limited to the context in which it was announced—an officer's statement that he will get a warrant when the officer has probable cause to do so is not unconstitutionally coercive. *Cf. State v. Williamson*, 307 Or 621, 627, 772 P2d 404 (1989) (Carson, J., concurring) (recasting the statement quoted in *Hirsch* and explaining that, when an officer says that he or she "will seek a search warrant," that statement is not coercive).

not unconstitutionally coerce a suspect's decision whether to consent to a blood draw. By the same token, it is equally difficult to say that every unlawful sanction will always exert an unconstitutionally coercive effect on a suspect's decision to consent. The consequences of some unlawful sanctions may be so minor that they would have no appreciable effect on a reasonable person's decision.

To avoid confusion, I do not mean to suggest that reminding a suspect of the adverse consequences that will flow from whatever decision he or she makes will automatically render the resulting choice involuntary. Rather, my point is that, when an officer has advised a suspect of the consequences of refusing to consent, the voluntariness inquiry should focus on, among other things, the effect those consequences would have on a reasonable suspect's decision, the alternatives available to the suspect,[4] and the extent to which the consequences are the result of an earlier voluntary choice that the suspect made.[5] Asking only whether those consequences are lawful or unlawful may obscure the correct analysis.

I recognize that the majority qualifies the proposition that it draws from *Douglas* and *Hirsch* by adding the word "ordinarily." However, that word leaves much unanswered. Even if one assumes that knowledge of lawful sanctions ordinarily will not unconstitutionally coerce a

---

[4] *Compare State v. Graf*, 316 Or 544, 853 P2d 277 (1993) (in light of the options available to a state employee, holding a pretermination hearing before deciding whether to discharge the employee for conduct that also constituted a crime did not unconstitutionally coerce the employee into giving up his right against self-incrimination to avoid losing his job), *with Garrity v. New Jersey*, 385 US 493, 87 S Ct 616, 17 L Ed 2d 562 (1967) (ordering a state police officer to surrender his right against self-incrimination or face the loss of his job unconstitutionally coerced his waiver of the right).

[5] Assume, for example, that an inmate chooses to accept parole knowing that one of the conditions of parole is that he must consent to a search of his home if the parole officer reasonably suspects that it contains controlled substances and that the consequence of refusing consent is that parole will be revoked and the parolee will have to serve the remainder of his sentence. On the one hand, the prospect of incarceration if a person refuses consent ordinarily would render most decisions to consent involuntary. On the other hand, when that consequence flows from an earlier voluntary choice made to secure the benefits of parole, a parolee who consents to a search to avoid returning to prison can hardly claim that his consent was involuntarily coerced, even when the officer reminds the parolee of that consequence.

person's decision, when will the ordinary answer not suffice? In my view, the factors noted above, among others, bear on that issue, and we should be asking a different question (or perhaps additional questions) from the single question that the dissent noted in *Douglas* and that the majority repeated in *Hirsch*. For that reason, I do not concur in all the majority's reasoning.

For me, the difficulty with this case is that defendant, perhaps influenced by our decision in *Hirsch*, has not asked the right question. Had he done so, we would have the benefit of the parties' considered arguments on that issue. It does not, however, seem appropriate to resolve the case on an issue that the parties have not briefed, and, as noted above, I do not disagree with the majority's answer to the issue on which defendant has focused. Accordingly, I concur in the majority's opinion in part and also in the judgment.

Walters, J., joins in this concurring opinion.