Dissenting Opinion by
NAKAYAMA, J.,
in which RECKTENWALD, C.J., joins.
The Majority holds that the criminal sanctions for refusing to submit to a breath or blood alcohol test provided by Hawaii Revised Statutes (HRS) § 291E-68 (Supp.2012) are inherently coercive, thus rendering Defendant Yong Shik Won’s (Won) otherwise voluntary consent invalid. As a result, the Majority has deemed a duly enacted statute unconstitutional in all but a very narrow set of circumstances. A number of state and federal courts have considered the constitutionality of statutes similar to that at issue here, and none of them have held that a driver’s decision to agree to take a breath or blood test is coerced simply because the state has attached the penalty of making it a crime to refuse the test. While Hawaii’s constitution can provide greater protections than those of other states, the statute at issue here fully complies with well-established principles of Hawaii constitutional law.
I dissent. I would hold that the legislature properly exercised its constitutional authority when it criminalized the refusal to submit to breath or blood alcohol testing pursuant to Hawaii’s implied consent statutes. In this case, Won’s cooperation with lawful implied consent procedures constituted real and voluntary consent that excused the officers from obtaining a warrant. Accordingly, I would affirm Won’s conviction and sentence.
DISCUSSION
I.
This court bears a heavy burden when it is tasked with declaring a law unconstitutional. As Chief Justice John Marshall has explained:
The question, whether a law be void for its repugnancy to the constitution, is, at all *360 times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other.
Fletcher v. Peck, 10 U.S. 87, 128, 6 Cranch 87, 3 L.Ed. 162 (1810) (Marshall, C.J.). A court of review cannot evade this solemn obligation by declaring that although a statute maintains some facial validity, it operates unconstitutionally in almost every case in which it might apply, and specifically, in those cases in which the legislature intended it to apply.
II.
A.
Implied consent laws have a long history of constitutional validity that dates back at least to the 1950s. In Breithaupt v. Abram, 352 U.S. 432, 435 & n. 2, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957), the Supreme Court was presented with the fact that Kansas had “by statute declared that any person who operates a motor vehicle ... shall be deemed to have given his consent to submit to a chemical test ... for the purpose of determining the alcoholic content of his blood.” The Court described Kansas’ implied consent law as a “sensible and civilized system protecting ... citizens not only from the hazards of the road due to drunken driving but also from some use of dubious lay testimony,” and held that although a defendant “was unconscious when [his] blood was taken, ... the absence of conscious consent, without more, does not necessarily render the taking a violation of a constitutional right.” Id. Accordingly, the Supreme Court acknowledged early on that implied consent can function as valid constitutional consent.[1]
Implied consent laws rely on the premise that “[djriving is a privilege, not a right,” and that it is therefore subject to regulation pursuant to the state’s police powers. See State v. Spillner, 116 Hawai'i 351, 364, 173 P.3d 498, 511 (2007); Illinois v. Batchelder, 463 U.S. 1112, 1116-17, 103 S.Ct. 3513, 77 L.Ed.2d 1267 (1983). One such regulation is that any person who operates a vehicle upon a public road shall be deemed, as a matter of law, to have given consent to OVUII testing. See HRS § 291E-11 (2006).[2] That is, by choosing to utilize the state’s highways, drivers voluntarily bring themselves under the regulation of the implied consent laws. See State v. Hanson, 97 Hawai'i 71, 75, 34 P.3d 1, 5 (2001) (stating that consent may be implied from an individual’s conduct); see also Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.2(1) (3d ed. 1996) (“Often it is said that ... consent is ‘implied’ ... because of the person’s conduct in engaging in a certain activity-”)-
Our legislature enacted an implied consent statute in 1967 as a principled “means of decreasing fatalities, injuries, damages and losses resulting from highway traffic accidents.” Rossell v. City & Cnty. of Honolulu, 59 Haw. 173, 181, 579 P.2d 663, 669 (1978). Implied consent laws encourage drivers suspected of OVUII to provide breath, blood, or urine samples by imposing substantial administrative sanctions on those who refuse to submit to chemical testing. See, e.g., HRS § 291E-41(c) (2004) (doubling the period of driver’s license revocation for an individual who refuses a breath, blood, or urine test). *361 These administrative sanctions operate constitutionally, as the Supreme Court has explained: “Given ... that the offer of taking a blood-alcohol test is clearly legitimate, the action becomes no less legitimate when the State offers a second option of refusing the test, with the attendant penalties for making that choice.” South Dakota v. Neville, 459 U.S. 553, 563-64, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983). Although “the choice to submit or refuse to take a blood-alcohol test will not be an easy or pleasant one for a suspect to make,” that choice “is not an act that is coerced by the officer.” Id.
The Supreme Court recently reaffirmed the constitutional validity of implied consent laws, and specifically acknowledged that these laws penalize refusal with significant administrative sanctions:
States have a broad range of legal tools to enforce their drunk-driving laws and to secure BAC evidence without undertaking warrantless noneonsensual blood draws. For example, all 50 States have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to BAC testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense.... Such laws impose significant consequences when a motorist withdraws consent; typically the motorist’s driver’s license is immediately suspended or revoked, and most States allow the motorist’s refusal to take a BAC test to be used as evidence against him in a subsequent criminal prosecution.
Missouri v. McNeely, — U.S. -, 133 S.Ct. 1552, 1566, 185 L.Ed.2d 696 (2013) (So-tomayor, J., plurality opinion) (emphasis added). Thus, the Supreme Court has characterized chemical testing performed pursuant to implied consent statutes as a viable alternative to a noneonsensual blood draw.
Similarly, this court has recognized that the constitutional validity of Hawaii’s implied consent regime “has long been established,” State v. Severino, 56 Haw. 378, 380, 537 P.2d 1187, 1189 (1975), and this is in accord with the uniform view of our sister jurisdictions. See, e.g., State v. Moore, 354 Or. 493, 318 P.3d 1133, 1137 (2013) (“[A] police officer’s accurate statement of the potential lawful adverse consequences resulting from a refusal ordinarily cannot be deemed to unlawfully coerce a defendant’s consent to a search or seizure.”); State v. Padley, 354 Wis.2d 545, 849 N.W.2d 867 (Wis.App.2014) (“[V]oluntary consent to a blood draw is not negated by the fact that consent was procured by informing a suspect that the alternative is a penalty for refusing to comply with the implied consent law.”).
In sum, implied consent laws have a long history of constitutional validity that encompasses the significant administrative consequences that such laws impose on individuals who revoke consent. See, e.g., Severino, 56 Haw. at 380, 537 P.2d at 1189; Breithaupt, 352 U.S. at 435 & n. 2, 77 S.Ct. 408; Moore, 318 P.3d at 1137. Accordingly, appellate courts have uniformly held that a driver provides constitutionally effective consent by cooperating with chemical testing pursuant to the terms of a lawful implied consent regime.
B.
The key question in this case is whether the criminal sanctions that accompany the revocation of implied consent unconstitutionally coerce individuals to submit to OVUII testing. This question hinges on whether the constitution permits the legislature, in exchange for granting the privilege of operating a vehicle on the state’s highways, to require that drivers condition their right to revoke implied consent on misdemeanor criminal sanctions. If so, a police officer’s accurate statement of the potential lawful adverse consequences of a refusal could not be deemed inherently coercive. See, e.g., Neville, 459 U.S. at 563-64, 103 S.Ct. 916; Moore, 318 P.3d at 1137.
Prior to the Supreme Court’s recent decision in Missouri v. McNeely, the constitutionality of criminal refusal sanctions appeared beyond dispute. In Schmerber v. California, 384 U.S. 757, 770-71, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the Supreme Court held that a warrantless blood draw taken from a non-consenting OVUII defendant did not violate his right against unrea *362 sonable search and seizure. The Court explained:
The officer in the present case might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence. We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system.,.. [W]e conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitionei-’s arrest.
Id. (internal citation and quotation marks omitted).
Following Schmerber, courts nationwide adhered to the view that no exigency beyond the natural evanescence of intoxicants in the blood stream—present in every OVUII case—would be required to establish an exception to the warrant requirement. Thus, in Neville, the Supreme Court explained that there was no constitutional right to refuse to submit to a blood test:
The simple blood-alcohol test is so safe, painless, and commonplace, see Schmerber, 384 U.S., at 771, 86 S.Ct., at 1836, that respondent concedes, as he must, that the state could legitimately compel the suspect, against his will, to accede to the test.
[[Image here]]
[Although] the right to silence underlying the Miranda warnings is one of constitutional dimension, ... [the] right to refuse [a] blood-alcohol test, by contrast, is simply a matter of grace bestowed by the [state] legislature.
459 U.S. at 563-64, 103 S.Ct. 916 (emphasis added). Other courts similarly ascribed to the view that the right to refuse was a matter of legislative grace that lacked a constitutional dimension. See, e.g., People v. Sudduth, 65 Cal.2d 543, 55 Cal.Rptr. 393, 421 P.2d 401, 403 (1966) (Traynor, C.J.) (“Suspects have no constitutional right to refuse a test designed to produce physical evidence in the form of a breath sample.”). And this court, following the national trend, stated: “Schmerber permits the police to take a blood sample from a person lawfully arrested for driving while intoxicated despite his refusal to submit to the blood test.” Rossell, 59 Haw. at 179, 579 P.2d at 667-68 (1978).
As a consequence of Schmerber and Ne-ville, the Fourth Amendment appeared to accommodate criminal refusal sanctions under the theory that any chemical test taken cooperatively pursuant to the implied consent law would have also been constitutionally permissible as a forced test had the person refused to cooperate. For example, in Burnett v. Municipality of Anchorage, 806 F.2d 1447, 1450 (9th Cir.1986), the Ninth Circuit held that a breathalyzer test administered in accordance with Alaska’s criminal implied consent regime “is an appropriate and reasonable search incident to arrest which appellants have no constitutional right to refuse.” The court also rejected the argument “that by criminalizing refusal, the state has attached an unconstitutional condition to the privilege of using the state’s highways ,.. because there is no Fourth Amendment right to refuse a breathalyzer examination.” Id. This decision was in accord with other state appellate courts adjudicating Fourth Amendment challenges to criminal refusal schemes. See, e.g., State v. Hoover, 123 Ohio St.3d 418, 916 N.E.2d 1056, 1061-62 (2009) (“Asking a driver to comply with conduct he has no right to refuse and thereafter enhancing a later sentence upon conviction does not violate the constitution.”); cf. Quintana v. Mun. Court, 192 Cal.App.3d 361, 237 Cal.Rptr. 397 (1987) (holding that although criminal refusal sanctions burden a fundamental right, such sanctions meet strict scrutiny).
Thus, piior to McNeely, implied consent tests obtained on pain of criminal sanction appeared to be absolutely justifiable as a subset of permissible Schmerber tests. Indeed, our legislature specifically considered this aspect of Schmerber when, in 2010, it criminalized refusal. See 2010 House Journal, at 838 (statement of Rep. Har) (“Essentially, because of this seminal case, this U.S. Supreme Court case, the power of police, they can forcibly extract a blood sample or any type of chemical sample from the defendant if they’re suspected of DUL”). In other words, when the legislature adopted HRS § 291E-68, members were specifically aware *363 of the then-prevailing understanding of the Fourth Amendment that had been enunciated by this court, by the Supreme Court, and by notable jurists nationwide. See, e.g., Rossell, 59 Haw. at 179, 579 P.2d at 667-68; Neville, 459 U.S. at 563-64, 103 S.Ct. 916; Sudduth, 55 Cal.Rptr. 393, 421 P.2d at 403 (Traynor, C.J.).
The paradigm changed fundamentally in 2013, when the Supreme Court held that “in drunk-driving investigations, the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant.” McNeely, 133 S.Ct. at 1568. Thus, when confronted with a “routine” OVUII case in which no “special facts” beyond the natural dissipation of alcohol in the bloodstream were present, the Supreme Court affirmed the suppression of noncon-sensual blood test evidence obtained without a warrant. Id. By endorsing the defendant’s right to insist on a warrant, the Supreme Court repudiated the long-standing understanding of Schmerber, i.e. that a defendant’s right to refuse a blood test lacked a constitutional dimension. See, e.g., Rossell, 59 Haw. at 179, 579 P.2d at 667-68; Neville, 459 U.S. at 563-64, 103 S.Ct. 916. As a result, implied consent regimes have been decoupled from Schmerber, and can no longer be justified solely on the ground that defendants lack a constitutional right to refuse to have blood taken or that the right to refuse is merely a matter of legislative grace.
Nonetheless, there are independent constitutional grounds that justify conditioning the privilege of driving on an agreement that the revocation of implied consent carries a misdemeanor criminal sanction.
C.
Hawai'i is one of thirteen states to impose some form of criminal sanction on individuals who revoke their implied consent to OVUII testing.[3] With the exception of the Majority in this case, the uniform view of appellate courts is that implied consent regimes that impose criminal refusal sanctions do not violate the Fourth Amendment.
As previously explained, prior to McNeely, such laws appeared unassailable. See, e.g., Rossell, 59 Haw. at 179, 579 P.2d at 667-68; Neville, 459 U.S. at 563-64, 103 S.Ct. 916; Burnett, 806 F.2d at 1450; Quintana, 192 Cal.App.3d 361, 237 Cal.Rptr. 397; Hoover, 916 N.E.2d at 1061-62. After McNeely, this has remained the uniform view. For example, several appellate courts have held that imposing a criminal sanction on the right to refuse does not constitute an unconstitutional condition. See, e.g., Beylund v. Levy 859 N.W.2d 403 (N.D.2015) (holding that a criminal refusal statute did not violate the Fourth Amendment under the doctrine of unconstitutional conditions); State v. Chasingbear, 2014 WL 3802616, at *3-8 (Minn.Ct.App. Aug.4, 2014); State v. Janssen, 2014 WL 6909682, at *12-13 (Kan.App. Dec. 5, 2014).
Similarly, several appellate courts have directly upheld the imposition of criminal refusal sanctions against defendants who revoked their implied consent. See, e.g., State v. Bernard, 859 N.W.2d 762, 764 (Minn.2015) (“[Because] the breath test the police asked Bernard to take would have been constitutional as a search incident to a valid arrest, ... charging Bernard with criminal test refusal does not implicate a fundamental right.”); State v. Birchfield, 858 N.W.2d 302 (N.D.2015) (affirming the defendant’s conviction for criminal refusal against a Fourth Amendment challenge).
Finally, in circumstances like the present ease, courts have uniformly held that cooper *364 ation with a criminal implied consent regime yields real and voluntary consent that excuses officers from obtaining a warrant. See State v. Smith, 849 N.W.2d 599, 606 (N.D.2014) (“[A]n individual’s consent is not coerced simply because a criminal penalty has been attached to refusing the test or that law enforcement advises the driver of that law.”); People v. Harris, 225 Cal.App.4th Supp. 1, 170 Cal.Rptr.3d 729, 735 (Cal.App.Div.Super.Ct.2014) (“The fact that there are [criminal] penalties for refusal to cooperate with [OVUII] testing upon arrest does not render the consent illusory or coercive.”), aff'd, 234 Cal.App.4th 671, 184 Cal.Rptr.3d 198 (2015); Janssen, 2014 WL 6909682, at *10 (rejecting defendant’s argument that “the notification under the implied consent advisories that refusing testing could lead to criminal prosecution coerced his consent”); State v. Nece, 2014 WL 5313744, at *8 (Kan.App. Oct. 10, 2014) (“[T]he fact that Hornseth informed Nece about the potential for criminal prosecution of a test refusal under the implied consent advisories did not render Nece’s consent involuntary.”); State v. Brooks, 838 N.W.2d 563, 570 (Minn.2013) (“[A] driver’s decision to agree to take a test is not coerced simply because Minnesota has attached the penalty of making it a crime to refuse the test.”).
Although some of these reported decisions rely on a view of Schmerber that McNeely repudiated—i.e. that the right to refuse lacks a constitutional dimension—because criminal refusal sanctions are not unconstitutional conditions, these decisions are fundamentally correct, See Quintana, 192 Cal.App.3d 361, 237 Cal.Rptr. 397 (holding that although criminal refusal sanctions burden a fundamental right, such sanctions meet strict scrutiny).[4]
III.
The fundamental question is whether the Hawai'i legislature had the constitutional authority to criminalize the withdrawal of implied consent, which, by comparison, has been upheld in jurisdictions like California, Minnesota, and North Dakota, among many others. See, e.g., Harris, 170 Cal.Rptr.3d at 735; Birchfield, 858 N.W.2d 302; Bernard, 859 N.W.2d 762. If so, the implied consent form accurately advised Won of the potential adverse consequences of refusal, and his cooperation with lawful implied consent procedures was not unlawfully coerced. This question is governed by the test for unconstitutional conditions articulated in Nakamoto v. Fasi, 64 Haw. 17, 22, 635 P.2d 946, 951 (1981).
A.
In Nakamoto, this court addressed “the critical question of whether the City [of Honolulu could] require submission to a search as a condition of entry into the Neal Blaisdell Center.” As the court explained:
The City is free to adopt and enforce reasonable rules restricting the time and manner of use of its premises, for members of the public do not have the absolute and unfettered right to enter or to make use of a City-owned facility. But once having extended ... an invitation to the public to use its arena upon paying the price of admission, it could not further condition the exercise of this privilege upon compliance with an unconstitutional requirement.
Id. Accordingly, the court turned to the question of whether a mandatory search condition designed to mitigate the risk posed by contraband containers of alcohol (i.e. bottles and cans) was unconstitutional.
To adjudicate this question, the court articulated a heightened standard of constitutional scrutiny: “In the absence of a compelling circumstance, a citizen [may not be] required to relinquish his [or her] constitutional right to be free from unreasonable searches and seizures, in order to be allowed to exercise a privilege.” Id. at 22-23, 635 P.2d at 952. *365 The court explained that “necessity in terms of possible harm to the public ... must be weighed against the Fourth Amendment interest of the individual,” and determined that “[o]nly where the public interest clearly outweighs the privacy interest of the individual may he be required to surrender his Fourth Amendment protection.” Id. at 23, 635 P.2d at 952 (emphasis added). The court also cautioned that “[t]he degree to which a citizen may be required to relinquish a constitutional right, in the interests of public safety, must be commensurate with the extent and nature of the threatened harm,” and should “be limited to the very minimum necessary to accomplish the governmental objective.” Id. at 24-25, 635 P.2d at 953.
Applying these standards, the court held that the mandatoiy search condition at issue was unconstitutional for two reasons. First, the court was unable to conclude that the asserted public safety interest—the risk posed by “a can or bottle which might be thrown with resulting injuries,”—clearly outweighed individual privacy interests: “[Tjhere has been no showing that the threat to the public safety at rock concerts has been so pervasive and of such magnitude as to justify” the mandatory search condition. Id. at 23, 635 P.2d at 952.
The court distinguished the challenged search from the lawful imposition of mandatory searches at airports and courthouses, stating: “[I]t cannot be seriously argued that the threat to public safety in the present case is as grave as those which justified suspending the warrant requirement in airport and courthouse searches.” Id. at 24-25, 635 P.2d at 953. In those circumstances, the court explained, the public interest would clearly outweigh individual privacy interests:
Airport and courtroom searches have received judicial sanction essentially because of the magnitude and pervasiveness of the danger to the public safety. The overriding concern in these areas has been the threat of death or serious bodily injury to members of the public posed by the introduction of inherently lethal weapons or bombs. Constitutional provisions, obviously, were never intended to restrict government from adopting reasonable measures to protect its citizenry.
[[Image here]]
“The courts have relaxed the strictures of the Fourth Amendment in light of the unprecedented violence experienced in these two public areas.”
Id. (quoting Collier v. Miller, 414 F.Supp. 1357, 1362 (S.D.Tex.1976) (emphases added)). Thus, the court concluded that a mandatory search condition would be acceptable if the threat of death or serious bodily injury to members of the public was implicated and the terms of the search were appropriate. Id.
Turning to its second rationale, the court concluded that the mandatory search condition was not sufficiently tailored to limit the imposition on individual privacy. For example, the search at issue lacked “articulable facts to support a conclusion that the person searched may be in possession of [a] prohibited item.” Id. at 23, 635 P.2d at 952. And in the absence of “clear guidelines ... too much was left to the discretion of the security guards.” Id. Thus, the program was “fatally flawed by the great potential for arbitrary and random enforcement.” Id. However, the court emphasized that minimally intrusive searches like “a brief stop and a cursory examination,” or the use of “magnetometers” at airports help to “minimize! ] citizen inconvenience, resentment and embarrassment,” and thus are more likely to withstand constitutional scrutiny. Id. at 24-25, 635 P.2d at 953.
B.
Applying the standards enunciated in Na-kamoto to this case, I conclude that the Hawai'i legislature did not exceed its constitutional authority when it conditioned the privilege of driving on cooperation with an implied consent regime that imposes criminal refusal sanctions.
1.
The first question is whether the state’s interest in highway safety is “compelling,” that is, whether it “clearly outweighs the privacy interest of the individual.” Nalcamo *366 to, 64 Haw. at 23, 635 P.2d at 952. I would conclude that it does.
“The carnage caused by drunk drivers is well documented,” Neville, 459 U.S. at 558, 103 S.Ct. 916, and, in fact, “exceeds the death toll of all our wars,” Perez v. Campbell, 402 U.S. 637, 657, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971) (Blackmun, J., concurring), Given the magnitude and pervasiveness of the danger to the public, the Supreme Court has repeatedly recognized that states have a “compelling interest in highway safety.” Mackey v. Montrym, 443 U.S. 1, 19, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979); Dixon v. Love, 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977). This interest is particularly acute in Hawai'i, where the annual percentage of traffic fatalities caused by drunk driving is among the highest in the nation.[5] In 2012 alone, 47 individuals were killed by drunk drivers in this state, and in 2013, 33 more were killed.[6] Thus, although “some progress has been made, drunk driving continues to exact a terrible toll on our society.” McNeely, 133 S.Ct. at 1566.
Relatedly, in criminalizing the refusal to submit to breath or blood alcohol testing, the Hawai'i legislature noted, “[w]hile gains have been made in reducing both driving under the influence arrests and the total number of alcohol-related fatalities, today’s offender is more likely to have a highly elevated alcohol concentration and, as a whole, Hawaii’s rate of alcohol-related fatalities remains unacceptably high.” Conf. Com. Rep. No. 88-10, in 2010 Senate Journal, at 761. In subsequently amending the criminalization law, the legislature stated,
[o]ver the past several years, Hawai'i has had a high incidence of alcohol-related traffic fatalities. While enforcement of existing laws governing the operation of a vehicle under the influence of an intoxicant has had an impact on alcohol-related traffic fatalities, the Legislature determined that more needed to be done to substantially reduce the number of fatalities.
Conf. Com. Rep. No, 56-12, in 2012 House Journal, at 1627. The legislature also noted there was an average of 5,500 arrests for OVUII in Hawai'i each year. Conf. Com. Rep. No. 56-12, in 2012 House Journal, at 1627.
Two leading indicators correlate with drunk-driving fatalities, (1) extreme OVUII and (2) recidivism. Extreme OVUII is typically defined as operating a vehicle with a BAC of 0,15 or higher, and is present in approximately sixty percent of fatal drunk-driving accidents.[7] With respect to recidivism, “research shows that drivers involved in fatal accidents with blood alcohol levels above the ... legal limit are eight times more likely to have had a prior conviction for impaired driving.”[8] And there is a demonstrable link between extreme OVUII and recidivism.[9]
Compounding these issues is the problem of breath test refusal, which occurs in approximately 10% of cases in Hawai'i,[10] and the fact that “repeat offenders refuse the test more frequently than first-time offenders.” [11] *367 Because “the inference of intoxication arising from a positive blood-alcohol test is far stronger than that arising from a refusal to take the test,” Neville, 459 U.S. at 564, 103 S.Ct. 916, it is no surprise that refusals “increase[] the likelihood of a plea bargain, nolle, or reduced criminal penalty.”[12] As a result, the State is unable to impose the kind of swift and certain sanctions that are critical to protect the public by discouraging recidivism. The threat of “administrative penalties [has simply] not [proven] severe enough to deter refusals by repeat offenders.”[13] When the legislature included the addition of criminal penalties for refusal, it noted that, “[i]n 2006, Hawaii’s alcohol-related traffic fatality rate of 52 percent was the highest in the nation. Sadly, this trend appears to be continuing despite efforts to curb this type of behavior since, in 2008, 43 percent of drivers involved in traffic fatalities tested positive for alcohol.”[14] Accordingly, the legislature was justified in its passage of criminal refusal sanctions insofar as those sanctions further a compelling public safety interest by targeting the most deadly offenders.
In sum, the threat to public safety caused by drunk driving and the related problem of breath test refusal are “so pervasive and of such magnitude” that “the public interest clearly outweighs the privacy interest of the individual.” Nakamoto, 64 Haw. at 23, 635 P.2d at 952. Indeed, the “carnage” caused by drunk driving greatly exceeds the “unprecedented violence” at airports and courthouses that this court has already described as sufficient to justify a mandatory warrant-less search procedure. Id; Perez, 402 U.S. at 657, 91 S.Ct. 1704 (Blackmun, J., concurring) (“The slaughter on the highways of this Nation exceeds the death toll of all our wars.”).
2.
The second question is whether the provisions of Hawaii’s implied consent regime are “commensurate with the extent and nature of the threatened harm.” Nakamoto, 64 Haw. at 25, 635 P.2d at 953. The presence of several procedural safeguards indicates that the intrusion on privacy occasioned by the criminal refusal scheme is “limited to the very minimum necessary to accomplish the governmental objective.” Id at 24, 635 P.2d at 953.
First, unlike the search in Nakamoto that lacked even articulable suspicion, here both probable cause and a lawful arrest are required before a law enforcement officer may initiate implied consent procedures. See HRS § 291E-11(b) (Supp.2006). In addition, once implied consent procedures are initiated, officers are required to follow an extensive set of guidelines that mitigate the potential for “arbitrary and random enforcement.” Nakamoto, 64 Haw. at 24, 635 P.2d at 952. Thus, officer discretion has been almost completely removed by the terms of Hawaii’s implied consent law.
Second, the implied consent statutes offer arrestees the choice between three minimally intrusive and medically standardized procedures, thus limiting “citizen inconvenience, resentment, and embarrassment.” Id at 25, 635 P.2d at 953. Neville stated that a “simple blood-alcohol test is so safe, painless and commonplace,” that it is “clearly legitimate.” 459 U.S. at 563, 459 U.S. 553; see also Schmerber, 384 U.S. at 771, 86 S.Ct. 1826 (“[T]he quantity of blood extracted is minimal, and ... for most people the procedure involves virtually no risk, trauma, or pain.”). Urine tests are even less intrusive than blood tests because they do not require venipunc-ture. Least intrusive is the breath test. In any event, the suspect is given a choice between three well-accepted and minimally intrusive tests, and thus, the intrusion on privacy caused by the testing itself is very limited.
Third, the state has a compelling interest in avoiding violent encounters between police officers and its citizens. Although the state may undoubtedly compel an arrestee against his or her will to submit to a blood draw if it *368 obtains a warrant, Hawaii’s implied consent regime removes that possibility by requiring officers to honor refusal. HRS § 291E-15 (Supp.2010) (mandating that if an arrestee refuses a test for OVUII, “none shall be given”). However, the right to refuse is conditioned on a penalty, so as “‘to equip [law enforcement] officers with an instrument of enforcement not involving physical compulsion.’” Rossell, 59 Haw. at 182, 579 P.2d at 669 (citation omitted). In other words, the penalty provisions of Hawaii’s implied consent regime are tailored to reduce the imposition on individual autonomy by avoiding “the violence which would often attend forcible tests upon recalcitrant inebriates.” Id.
Fourth, arrestees are offered a real choice to refuse to submit to testing, albeit a conditional one. See HRS § 291E-15 (“If a person under arrest refuses to submit to a breath, blood, or urine test, none shall be given.”). That officers are statutorily required to honor a defendant’s refusal gives “some intimation that [the defendant’s] objection would be meaningful [and] that the search is subject to his [or her] consent.” Nakamoto, 64 Haw. at 21, 635 P.2d at 951.
Fifth, criminal refusal sanctions are commensurate with the extent of the threat to public safety, because the threat of “administrative penalties [have] not [proven] severe enough to deter refusals by repeat offenders.” [15] In other words, a less intrusive option has proven ineffective in deterring the most dangerous offenders.
Finally, the intrusiveness on privacy is minimized by the fact that OVUII arrestees are in custody, and thus, have a diminished expectation of privacy. See, e.g., Maryland v. King, — U.S. -, 133 S.Ct. 1958, 1978, 186 L.Ed.2d 1 (2013) (“The expectations of privacy of an individual taken into police custody necessarily are of a diminished scope. A search of the detainee’s person ... may involve a relatively extensive exploration, including requiring at least some detainees to lift their genitals or cough in a squatting position.” (internal quotation marks and citations omitted)).
In sum, the procedures of Hawaii’s implied consent regime are “commensurate with the extent and nature of the threatened harm,” and are sufficiently tailored to ensure that any intrusion on privacy is “limited to the very minimum necessary.” Nakamoto, 64 Haw. at 24-25, 635 P.2d at 953. In addition, the state’s interest in protecting the public from the pervasive threat of death or serious bodily injury clearly outweighs the intrusion on individual privacy. Id. Accordingly, the legislature constitutionally conditioned the right to revoke implied consent on misdemeanor criminal sanctions.
Because Won was accurately advised of the lawful adverse consequences of refusal, his consent to a breath test according to implied consent procedures was freely and voluntarily given. See Moore, 318 P.3d at 1137 (“[A] police officer’s accurate statement of the potential lawful adverse consequences resulting from a refusal ordinarily cannot be deemed to unlawfully coerce a defendant’s consent to a search or seizure.”); Smith, 849 N.W.2d at 606 (“[A]n individual’s consent is not coerced simply because a criminal penalty has been attached to refusing the test or that law enforcement advises the driver of that law.”); Harris, 170 Cal.Rptr.3d at 735 (“The fact that there are [criminal] penalties for refusal to cooperate with [OVUII] testing upon arrest does not render the consent illusory or coercive.”).
Conversely, the Majority did not conduct a constitutional conditions analysis to evaluate whether HRS § 291E-68 is lawful when applied in the manner that the legislature intended. Thus, “the legislature is to be pronounced to have transcended its powers ... in a doubtful case,” Fletcher v. Peck, 10 U.S. at 128 (Marshall, C.J.), without full consideration of every argument that might be raised in favor of the statute’s constitutional operation.[16]
*369 8.
Based on my determination that Won’s breath test was obtained in a constitutional manner, I would resolve the remainder of his points on appeal as follows. First, it is well settled that “[i]n the context of an arrest for driving while intoxicated, a police inquiry of whether the suspect will take a blood-alcohol test is not an interrogation within the meaning of Miranda.” Neville, 459 U.S. at 564 n. 15, 103 S.Ct. 916. Thus, Won’s Fifth Amendment argument lacks merit.
Second, under my view of this case, Won was not misled about the possible sanctions accompanying refusal. Rather, he was accurately informed of the sanctions as follows: “[I]f you refuse to submit to a breath, blood, or urine test, you shall be subject to up to thirty days imprisonment and/or fine up to $1,000 or the sanctions of 291E-65, if applicable.” (Emphases added). Thus, Won was not misled into believing that these sanctions would be immediately or automatically imposed in violation of his due process rights.
Finally, although our prior decisions have held that “a motorist is not entitled to consult with counsel before deciding to submit to the chemical test,” see State v. Severino, 56 Haw. 378, 380-81, 537 P.2d 1187, 1189 (1975), if Won’s statutory right to counsel was indeed violated, he failed to demonstrate an adequate nexus between the alleged violation and his breath test evidence that would require exclusion of the test results. See State v. Edwards, 96 Hawai'i 224, 237-39, 30 P.3d 238, 251-53 (2001) (requiring that “the defendant ... demonstrate, by a preponderance of the evidence, a connection between the statutory violation and the evidence to be suppressed.”). This is particularly true where, as here, police officers relied in good faith on this court’s prior precedent.[17]
IV.
The Majority does not hold that HRS § 291E-68 is unconstitutional on its face. Rather, it has held that HRS § 291E-68 operates unconstitutionally in almost every situation in which it might apply:
the position in which Won was placed, because of the criminal sanction for refusal, the forced selection between constitutional rights, and the potential significant punishment the sanction entailed, was inherently coercive.
[[Image here]]
For this reason, Won’s election on the Implied Consent Form to submit to a BAC test is invalid as a waiver of his right not to be searched.
Majority at 339, 372 P.3d at 1085 (internal citations omitted). Thus, under the Majority opinion, consent to OVUII testing is involuntary per se if the defendant has been made aware of the criminal refusal sanctions provided by HRS § 291E-68. In other words, the Majority has declared that HRS § 291E-68 is unconstitutional when applied in the manner intended by the legislature and in the overwhelming majority of cases. Although the Majority has not declared the statute completely invalid, it has done so in effect.[18]
*370 CONCLUSION
For the foregoing reasons, I would affirm Won’s conviction and sentence.[19]

. The Hawai'i legislature has similarly declared: "The consent of a person ... shall not be withdrawn by reason of the person's being dead, unconscious, or in any other condition that renders the person incapable of consenting to examination, and ... [i]n such event, a test of the person’s blood or urine shall be administered.” HRS § 291E-14 (2000).

. "OVUII” stands for operating a vehicle under the influence of an intoxicant, and is the standard term used for drunk driving in Hawaii. Throughout this dissent OVUII is used interchangeably with the acronyms "DUI" and "DWI,” which other jurisdictions use to denote driving under the influence and driving while intoxicated, respectively.

. See Alaska Stat. Ann. §§ 28.35.031, 28.35.032 (West, Westlaw through 2014 2nd Reg. Sess.); Cal. Veh.Code §§ 23538, 23577 (West, Westlaw through Ch. 2 of 2015 Reg. Sess.); Fla. Stat. Ann. §§ 316.1932, 316.1939 (West, Westlaw through 2015 1st Reg. Sess.); Iowa Code Ann. § 321J.2 (West, Westlaw through 2015 Reg. Sess.); La.Rev.Stat. Ann. §§ 14:98.2, 32:666 (West, Westlaw through 2014 Reg. Sess.); Me. Rev.Stat. tit. 29-A, § 2521 (West, Westlaw through Ch. 9 2015 Reg. Sess.); Neb.Rev.Stat. §§ 60-6,197, 60-6,197.03, 60-6,197.04 (West, Westlaw through 2014 Reg. Sess.); Ohio Rev. Code Ann. § 4511.19 (West, Westlaw through Files 1, 3 and 4 of 2015-16 Reg. Sess.); 75 Pa. Cons.Stat. Ann. § 3804 (West, Westlaw through 2014 Reg. Sess.); R.I. Gen. Laws Ann. § 31—27— 2.1 (West, Westlaw through Ch. 555 2014 Legis. Sess.); Vt. Stat. Ann. tit. 23, § 1201 (West, West-law through 2014 Legis. Sess.); Va.Code Ann. § 18.2-268.3 (West, Westlaw through 2014 Leg-is. Sess.).

. However, an OVUII arrestee cannot be said to have consented to a forcible blood draw in contravention of a later expressed wish to withdraw his or her implied consent. See, e.g., State v. Wulff, 157 Idaho 416, 337 P.3d 575 (2014); Byars v. State, — Nev. -, 336 P.3d 939 (2014); State v. Fierro, 853 N.W.2d 235 (S.D.2014); State v. Villarreal, 475 S.W.3d 784 (Tex.Crim.App.2014); Weems v. State, 434 S.W.3d 655 (Tex.App.2014); State v. Aviles, 443 S.W.3d 291 (Tex.App.2014).

. See Traffic Safety Facts: Hawai'i 2009-2013, Nat'l Highway Traffic Safety Admin. (Dec. 2014), w ww-nrd.nhtsa. dot.gov/departments/nrd30/ncsa/STSI/l 5-H1/2013/15-HI-2013.-htm.

, See, Traffic Safety Facts, 2012 Data, Nat’l Highway Traffic Safely Admin. (Dec. 2013), www-nrd.nhtsa.dot.gov/Pubs/811870.pdf,

, See NHTSA, New In-Vehicle Technology Targeted Toward Habitual Drunk Drivers, Nat’l Highway Traffic Safety Admin. (Jan, 8, 2010), www. nhtsa.gov/PR/DOT-12-11.

. See Leonard A. Marowitz, Predicting DUI Recidivism: Blood Alcohol Concentration and Driver Record Factors, State Cal. Dep’t Motor Vehicles (May 1996), http://apps.dmv.ca.gov/about/ profile/rd/r_d_report/Section_5/S5-162.pdf.

. See Breath Test Refusal Rates in the United States, 2011 Update, Nat’l Highway Traffic Safety Admin. (Mar, 2014), www.nhtsa.gov/staticfiles/ nti/pdf/Breath_Test_RefusaLRates-811881 .pdf.

. Breath Test Refusals in DWI Enforcement, Nat’l Highway Traffic Safety Admin. (Aug. 2005), www.nhtsa.gov/staticfiles/nti/pdf/809876.pdf.

. See supra note 11.

. Id.

.See S.B. 2897, 25th Leg., Reg. Sess. (2010), available at http://www.capitol.hawaii.gov/ session2010/CommReports/SB2897_HDl_HSCR 718-10_.PDF,

. The Majority rests its determination on the fact that criminal refusal sanctions are "inherently coercive,” in other words, coercive as a matter of law. My discussion has been limited to that issue. There have been no allegations in this case that Won's consent was otherwise involuntary under the totality of the circumstances.
*369 Moreover, the Majority's cited cases do not support its far-reaching conclusion. The Majority cites to State v. Villarreal, 475 S.W.3d 784, 810-11 (Tex.Crim.App.2014), which suppressed Villarreal's blood results due to lack of consent. Villarreal, unlike Won, was forced to submit to a blood test over his objection, as was required by Texas Transportation Code, Section 724.012(b), an important distinction that the Villarreal court noted. See id. ("[I]n the context of nonconsensual, warrantless bodily search of a person suspected of criminal activity, a statute providing for irrevocable implied consent cannot supply the type of voluntary consent necessary to establish and exception to the Fourth Amendment warrant requirement.”) (emphasis added).
The Majority also cites to Aviles v. State, 443 S.W.3d 291, 294 (Tex.App.2014), and State v. Fierro, 853 N.W.2d 235, 243 (S.D.2014), to support the argument that implied consent statutes are not exceptions to the warrant requirement. Critically, however, neither case (nor any other) holds that consent to a blood or breath test is coerced and rendered involuntary merely because there are consequences for refusal, including criminal penalties.

. I agree with the Majority that counsel may be of value in these circumstances, and that an attorney does not necessarily violate his or her ethical obligations by accurately advising a client of the potential consequences of submitting to or refusing a breath test.

. Pursuant to the Majority opinion, if a police officer obtains a warrant or if exigent cir *370 cumstances are present and the defendant then refuses to submit to OVUII testing, refusal sanctions may constitutionally be imposed. However, this is practically irrelevant because, in such circumstances, a police officer has no need to obtain the defendant's consent to obtain BAC evidence.

. The posture of this case is unique in that Won did not challenge the voluntariness of his consent before trial. This argument was raised once the Supreme Court issued its decision in McNeely. Our use of a de novo standard of review in these circumstances does not obviate the usual standard of review for voluntariness of consent: "[T]he findings of a trier of fact regarding the validity of consent to search must be upheld unless clearly erroneous.” State v. Patterson, 58 Haw. 462, 469, 571 P.2d 745, 749 (1977).